263 P.2d 362

**HUDSON**

**v.**

**KELLY, State Treasurer.**

**No. 5817.**

Supreme Court of Arizona.

Nov. 13, 1953.

Darrell R. Parker, Phoenix, for petitioner.

Ross F. Jones, Atty. Gen., Timothy D. Parkman, Sp. Asst. to the Atty. Gen., Perry Ling, Special Counsel, Phoenix, for respondent.

R. G. Langmade, Phoenix, amicus curiae.

LA PRADE, Justice.

On July 18, 1953, this court ordered a peremptory writ of mandamus to issue in this proceeding which was determinative of the issues involving the constitutionality of the financial administration act of 1953. Due to the exigencies of the situation then existing no written opinion was delivered. Now having had time to prepare a written decision we hereby state the reasons for the issuance of the peremptory writ and the holding that the act was unconstitutional in its entirety.

On July 11, 1953, C. A. Hudson, doing business as Hudson Tire Company, invoked the original jurisdiction of this court to secure a writ of mandamus directed to J. W. Kelly, as state treasurer of the State of Arizona, to compel the latter to honor and pay a certain warrant theretofore issued by the state auditor to petitioner in payment of automobile tires that had been purchased from him by the state highway department.

Under the procedure that existed prior to June 29, 1953, this warrant would ordinarily have been paid as a matter of course. In this instance the respondent refused to pay the warrant for the reason that the Legislature, by Chapter 89, Laws of First Regular Session of the 21st Legislature, effective June 29, 1953, had enacted a completely new law providing, among other things, for the creation of a state purchasing agent in the division of purchase and property control of the newly created department of finance, and that the purchase from petitioner had not been made by the state purchasing agent. The treasurer offered the additional reason that the Act, Section 30(b), specifically declared that all purchases made contrary to the Act to be null and void. The respondent took it to be his duty, as custodian of the state's funds, not to pay them out on an order of an officer not authorized to audit the claim or order its payment by a warrant.

Petitioner claimed that said Chapter 89, creating a department of finance, was unconstitutional and void, and that as a consequence the treasurer had no legal excuse for not paying the warrant. Petitioner asserted that the Act was unconstitutional for the following reasons: (A) That the title of the Act as fatally defective and in contravention of Section 13, Part 2, of Article 4 of the Constitution of the State of Arizona, which provides as follows:

"Every act shall embrace but one subject and matters properly connect-

ed·therewith, which subject shall be expressed in the title; but if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be embraced in the title."

(B) That the Act purports to revise, amend and repeal existing statutes by reference, in contravention of Section 14, Part 2 of Article 4 of the Constitution of the State of Arizona, which provides as follows:

"No act or section thereof shall be revised or amended by mere reference to the title of such act, but the act or section as amended shall be set forth and published at full length."

(C) That the Act and the whole of the operative portions thereof seek to repeal existing statutes by implication and by undertaking to override the specific with the general provisions of the said Chapter 89; (D) That the Act constitutes an unlawful attempt to delegate legislative authority in contravention of Article 3 of the Constitution of the State of Arizona, providing for distribution of powers; (E) That the Act is unconstitutional and void for the reason that Section 10(a) thereof purports to strip the state auditor of all the powers, duties and authority of that office, and thereby violates Section 1 of Article 5 of the Constitution of the State of Arizona, enumerating executive officers of the state; and (F) That the Act is in its entirety so vague, indefinite and uncertain, both as to title and content, as to be unenforceable and unconstitutional under the rule of this court as announced in Hernandez v. Frohmiller, 68 Ariz. 242, 204 P.2d 854.

■ Prior to the effective date, June 29, 1953, the state's many offices, institutions, departments and agencies directly made necessary purchases of supplies and materials for their maintenance for which there was statutory authorization. Immediately after the effective date of the Act a most serious situation arose in that it was not until July 8, 1953, that the department of finance was activated by the appointment of board members who qualified the following day. A commissioner of finance was appointed on July 8th and qualified the same day. By the provisions of the bill, Section 8, there was created "a division of purchases and property control" to be supervised and controlled by a state purchasing agent. All purchases of supplies and materials are, by the terms of the Act, funneled through the division of purchases and property control. By the provisions of Section 30, all state agency purchases must be through the state purchasing agent, and all contracts for supplies made by him. All contracts otherwise made are declared to be null and void and the department head or employee making such contract is liable for the cost thereof. Serious penalties are set up for violation of the terms of the Act, and as a further penalty any officer or employee of a state agency found guilty of a violation of any of the provisions of the Act might also forthwith be removed from office or em-

ployment. Although the board was nominally activated on the 9th of July, 1953, two days before the purchases in the instant case were made the department of finance had not begun to function. The various heads of divisions had not been appointed other than the commissioner of finance, and there existed an aggravated state of uncertainty wherein the state's many offices, departments and agencies were in a serious state of quandary as to where and how to proceed in the matter of securing and paying for purchases and supplies. The Act made no provision for a transition period during which the state's offices, departments and agencies could functionally exist within the law, and a virtual state of paralysis of operation existed. This was the stage setting at the time the petition for the writ was filed. This court concluded to take jurisdiction, being of the opinion that under prior decisions of this court a writ should issue and that the constitutionality of the Act could be determined in such a proceeding. Tillotson v. Frohmiller, 34 Ariz. 394, 271 P. 867; Hudson v. Brooks, 62 Ariz. 505, 158 P.2d 661; Cockrill v. Jordan, 72 Ariz. 318, 235 P.2d 1009. See also Stockman v. Leddy, 1912, 55 Colo. 24, 129 P. 220, 221. Although the petition was for an alternative writ it was heard upon notice and was treated by the court and all the parties as an application for a peremptory writ. This hearing was had on the 17th day of July, 1953, at which time extensive arguments were heard. Written briefs had theretofore been filed with the court. The following day the court unanimously concluded that the financial administration act of 1953 was unconstitutional and void in its entirety, at which time it ordered that a peremptory writ issue directing the state treasurer to honor and pay the warrant under consideration.

At the time we directed the peremptory writ to issue we were mindful of the general rule that every legislative act is presumed to be constitutional, and every intendment must be indulged in by the courts in favor of its validity, and on many occasions had voiced its acknowledgment of the existence of this rule and had been guided by it. As late as March 30, 1953, in our case of State v. Gastelum, 75 Ariz. 271, 255 P.2d 203, 204, we said, referring to previous holdings of the court:

"* * * we have said that we would not declare a legislative act unconstitutional unless satisfied beyond a reasonable doubt of its unconstitutionality, * * *."

In the early case of Gherna v. State, 1915, 16 Ariz. 344, 361, 146 P. 494, 501, wherein an attack was made on the constitutionality of a law, this court made the following pronouncement with reference to the rule of construction to be followed:

"A pronouncement of the invalidity of an act or any part of an act of the people in their legislative capacity is, and must always be, approached with a delicacy which the situation invites. Under our oaths as judges, this power

must be exercised in cases; but nevertheless it is our plain duty to uphold an act of the law-making power whenever it is possible to do so. Every presumption is in favor of its validity, and the conflict between the legislative act and a constitutional provision must be very clear and utterly irreconcilable by any reasonable interpretation before this court would be called upon to annul the act or any separable part of it."

For other statements of the rule see Laney v. State, 20 Ariz. 416, 181 P. 186; State v. Davey, 27 Ariz. 254, 232 P. 884, 885; State v. Harold, 74 Ariz. 210, 246 P.2d 178; Duhame v. State Tax Commission, 65 Ariz. 268, 179 P.2d 252, 171 A.L.R. 684, and cases therein referred to.

At the time of the issuance of the writ we concluded that the Act patently violated Section 1 of Article 5 of the Arizona Constitution enumerating who shall constitute the executive officers of the state. We are still of the same opinion. This constitutional provision provides that

"The executive department of the state shall consist of governor, secretary of state, state auditor, state treasurer, attorney-general, and superintendent of public instruction * * *."

The section then in referring to these officers concludes by providing that

"* * * They shall perform such duties as are prescribed by this constitution and as may be provided by law."

This latter provision was repeated in Article 5, Section 9, which says:

"The powers and duties of secretary of state, state treasurer, state auditor, attorney-general, and superintendent of public instruction shall be as prescribed by law."

Clearly under the constitution the auditor is a member of the executive department of the state. Under our system of government, and of the state governments of the United States from the organization of the colonies and the states under our federal constitution, the offices of governor, secretary of state, state auditor, state treasurer and attorney general, have had a well-understood meaning and statute. They are words of long antiquity and in reference to officers of a government refer to offices occupied by these officers at common law.

In Wright v. Callahan, 1940, 61 Idaho 167, 99 P.2d 961, 964, it was said:

"At the time of the adoption and ratification of our Constitution the terms 'state auditor' and 'controller,' as evidenced by the constitutions and statutes of that period, were generally and commonly understood to connote a supervising officer of revenue whose duties were to audit all claims against the state. We must presume that the framers of our Constitution so employed the term 'state auditor'". Citing cases.

The duties of a governmental auditor at common law are well set forth in People ex

rel. Brown v. Green, 5 Daly, N.Y., 194, 200, where it is said:

"What is an auditor? Originally it meant an officer of the king, whose duty it was, at stated periods of the year, to examine the accounts of inferior officers and certify to their correctness (Blount's Dictionary of 1681; Cotgrove's Dictionary of 1632; Rastall's Termes de la Ley; Defoe's English Dictionary of 1732), and was afterwards used to designate those officers of the Court of Exchequer whose duty, according to Coke, was to take the accounts of the receivers of the king's revenue and 'audit and perfect them,' without, however, putting in any changes, their office being only to audit the accounts—that is, ascertain their correctness. (4 Coke's Inst. 107.) The very object of examining and auditing an account is to ascertain whether there are any errors or mistakes in it, and hence the definition of the verb 'to audit,' which is to examine, settle and adjust accounts—to verify the accuracy of the statement submitted to the auditing officer or body. (McElrath's Com. Dict.) 'At the present day,' says Wedgewood, one of the last writers upon the meaning of English words, 'this term is confined to the investigation of accounts, the examination and *allowance* of which is termed the *audit*.'"

It was determined by this court in Shute v. Frohmiller, 1939, 53 Ariz. 483, 90 P.2d 998, that no common-law powers or duties attach to the above enumerated constitutional officers, but only those prescribed by statute. Nevertheless generally speaking, those duties that have been prescribed for the office of auditor have been those of auditing, adjusting and settling the amount of claims against the state and payable out of funds of the state. See Code of 1877, Ch. 25; Rev.St. of Ariz. 1887, Tit. 60, Ch. 9; Rev.St. of Ariz. 1901, Tit. 1, Ch. VII; Rev. St. of Ariz. 1913, Tit. 1, Ch. VIII; Rev. Code of Ariz. 1928, Ch. 2, Art. 3; A.C.A. 1939, Ch. 4, Art. 3, § 4–301 et seq. In Arizona Territory these duties were first performed by a Board of Territorial Auditors, composed of the governor, secretary and attorney general. See Howell Code 1863, Ch. 20, p. 159. By act of the legislature in 1866, Acts of 1866, p. 27, the office of territorial auditor was created (annual salary $500, plus $150 for office expense), and to it was transferred the duties formerly performed by the Board of Territorial Auditors. From the creation of the office to statehood it retained its original status as a free and independent executive office, to audit the accounts of the state.

With the advent of statehood the auditor became a constitutional officer, with its incumbent being elected by the people and placed under bond. The duties of the officer now are and always have been those of general accountant of the state, and as such

has long been termed "the watchdog of the treasury". Such officer has always been independent, responsible only to the law, his bond and the electors at the polls.

It was undoubtedly intended by the framers of our Constitution that in the matter of auditing the accounts of all public officials and state agencies that this function was to be performed by an officer independent of the officers and agencies to be audited. This concept is violated in the Act under consideration in that the board of finance, through its division of purchases and property control, purchases all supplies and materials required by the state and its agencies, and then the board, through its divisions of accounts and control, audits its own purchases and expenditures. The result of this procedure is that the board of finance audits itself and sits in judgment on its own acts.

It is strenuously argued that the holding in the Shute case (supra) is to the effect that the constitution contains no implied limitations on the power of the legislature to take away all of the duties of any constitutional officer. Perhaps the opinion is susceptible of being so interpreted. The case said that there are no implied restrictions [53 Ariz. 483, 90 P.2d 1003]

" * * * other than that forbidding the imposition of duties that would interfere with the maintenance and preservation of the independence of the three branches of government. Any act of the legislature imposing upon an executive officer duties properly belonging to one of the other two branches would necessarily be invalid, even if enacted pursuant to the constitutional provision empowering it to prescribe what the functions of that office should be. With this exception the legislature's power to add to or take from these duties from time to time is full and complete under the provision stating that his duties 'shall be as prescribed by law,' as well as under section 2, Article XXII of the constitution which provides that the laws of the Territory of Arizona, and this includes those prescribing the duties of the attorney general, 'shall remain in force as laws of the State of Arizona until they expire by their own limitations or *are altered or repealed by law.*' Clearly, the framers of the constitution did not intend to authorize the legislature to alter or repeal the territorial statutes that prescribed his duties and remained in force as laws of the state and at the same time withhold from it the power to take similar action as to any common-law duties he may have had. People v. Santa Clara Lumber Co., supra [55 Misc. 507, 106 N.Y.S. 624]."

We think the court was in error when it said that the *only* implied restriction on the legislature was that of forbidding the imposition of duties that would interfere with the maintenance and preservation of

the independence of the three branches of government.

In addition to any implied restrictions, Sections 1 and 9 of Article 5 of the State Constitution have been construed to mean that there is an implied mandate to the legislature to prescribe the powers and duties of the executive officers created by the Constitution in Section 1 of Article 5. Shute v. Frohmiller, supra; Lockwood v. Jordan, 72 Ariz. 77, 231 P.2d 428. The mandate considered the grant of such powers and duties as would enable the auditor to perform the functions for which the office was created. Under the terms of the mandate the legislature has the power to enlarge or remove the duties and powers of the office as the future might require. But the language of the sections as construed negatives the power to destroy the offices created by removing all of the duties it was mandated to confer.

Judge Cooley, in his work on Constitutional Limitations, Chapter 5, p. 88, says:

"The *frame* of the Government, the grant of legislative power itself, the *organization of the executive authority,* the erection of the principal courts of justice, create implied limitations upon the law making authority as strong as though a negative was expressed in each instance." (Emphasis supplied.)

On the subject of limitations Judge Ross, speaking for this court, said:

"A limitation on the legislative power may be by direct prohibition or by implication, and when it is by implication its restraints on the Legislature· are no less binding than when expressly prohibited." Consolidated Arizona Smelting Co. v. Egich, 22 Ariz. 543, 199 P. 132, 135.

There was a purpose in the creation of the office of auditor which, by this Act, has been frustrated. We are not hesitant in holding that there exists the implied restriction against abolishing a constitutional office, in fact, if not in name. In any event the problem now under consideration was not before the court in that case where the only question before the court was the power of the legislature to place the control of one certain piece of litigation in hands of a person other than the attorney general.

Such also was the situation in the case of Lockwood v. Jordan, 72 Ariz. 77, 231 P.2d 428, where it was held following the case of Shute v. Frohmiller, supra, and other cases of like tenor, that the legislature was not precluded from removing from the office of auditor certain duties relating to post auditing.

By the very nature of the office in our scheme of government, the duties imposed by statute are comparable to the common-law duties of the office, added to and enlarged as the economies and necessities of this 20th Century demand. The finances of the state are so many and varied that a code for their administration was adopted in 1922, Sess. Laws 1922, Ch. 35, providing for the systematic administration and pro-

tection of finances of the state, known as the State Financial Code. Repealed and re-enacted by Ch. 86, Laws of 1943. This code now appears as part of Article 9 of Chapter 10, § 10–912 et seq. A.C.A.Supp. 1952. Upon the auditor, as general accountant of the state, has been impressed the duty of determining that the finances of the state are administered according to the provisions of laws making general and special appropriations.

As such the auditor must scrutinize every claim against the state, note and verify its genuineness, satisfy himself that the claimant is the party duly entitled thereto; that the claim is presented in due form; that an appropriation has been duly made to meet the demand; that the demand is clearly within the scope of the appropriation act; that the Act has been regularly and constitutionally adopted; that the demand is due when made, and it is within the auditor's province and within his powers to determine whether the claim is for a public purpose. Board of Regents of University, etc. v. Frohmiller, 69 Ariz. 50, 60, 208 P.2d 833, 840. All this, of course, must be done in the utmost good faith by a person skilled as an auditor and particularly familiar with state finances. When the claim in question was presented the auditor regularly examined the claim and ordered its payment, she being of the opinion at this time that the financial administration act of 1953 was unconstitutional and that the claim should be audited and paid under the provisions of law prevailing *prior* to the adoption of the Act.

By the provisions of the new Act, Section 9, supra, it is readily apparent that to the division of accounts and controls is assigned all the essential auditing duties of the state auditor and those duties that from the organization of the territory had devolved upon the office of auditor. To prescribe the duties of the constitutional officers insofar as they were not provided for in the constitution, the legislature, in compliance with the contemplations contained in the constitution—that duties would be prescribed—provided for and enumerated the duties of auditor. By the very nature of the office the duties prescribed were generally those inherent in the office of state auditor.

It was argued in the Shute case, supra, that if there were no constitutional restrictions upon the legislature in taking away some of the duties of a constitutional officer that it might take all the powers and duties away and in effect abolish the office. With reference to this argument the court said:

"* * * The legislature is given no authority whatever over the *existence of any office* created by the constitution and the *probability* that it would, in the exercise of its authority to prescribe powers and duties, go so far as to take all these from any officer and give them to another was so unlikely and remote that no limitation in this respect was placed upon it." (Emphasis supplied.)

The court was then of the opinion that no such bizarre attempt would ever be undertaken. But in the instant case this "probability" has come to pass, as we view the effect of the Act under consideration. In name only is the office of auditor not disturbed. The constitutional office of auditor contemplates a free and independent auditor, one whose executive actions and judgments are not subject to the dictates, review and approval of some appointive officer. Thousands of claims involving millions of dollars are now annually audited by the auditor with the aid and assistance of her deputy and numerous employees selected by her and owing allegiance to her. By the provisions of the Act, Section 8(b), the auditor, as controller and head of the division of accounts and control, can only employ and assign assistants with the *approval* of the commissioner. The auditor's authority to organize the division, adopt and promulgate rules for the handling of the duties of the division and to interpret and administer the laws relating to the functions of the division, auditing the state's accounts, must meet the *approval* of the commissioner. To such an extent has the office been so debased that it cannot be said that the auditor is a free and independent officer. The officer is subject to the whims, caprices and judgment of others, so much so that we are convinced that the office has in reality been stripped of all of its powers and duties.

In Shute v. Frohmiller, supra, this court in referring to the constitutional convention, said:

"* * * It knew full well that the legislature would not attempt, for instance, to transfer the duties of the secretary of state to the superintendent of public instruction or to impose those of the state treasurer on the attorney general, but that if it were convinced that *some* of the duties of any of the executive officers could be better carried out by one officer than another, or by some new officer, authority to make the change, without the necessity of adopting a new constitution, should exist." (Emphasis supplied.)

In the instant case it appears that the legislature should have known that it could not denude the office of its inherent powers and duties, even though they had been prescribed by statute, and leave the office as an empty shell. Such attempts have uniformly been denounced by courts of last resort.

In State ex rel. Josephs v. Douglas, 1926, 33 Nev. 82, 110 P. 177, 180, involving the validity of an act providing that the secretary of state be ex officio clerk of the Supreme Court, a constitutional office, the court said:

"Every constitutional officer derives his power and authority from the Constitution, the same as the Legislature does, and the Legislature, in the ab-

266

sence of express constitutional authority, is as powerless to add to a constitutional office duties foreign to that office, as it is to take away duties that naturally belong to it. The Legislature may do as it sees fit with offices of its own creation; may consolidate or abolish them; or may enact a statute making an office of its own creation ex officio to some constitutional office."

The court further said:

"It is well settled by the courts that the Legislature, in the absence of special authorization in the Constitution, is without power to abolish a constitutional office or to change, alter, or modify its constitutional powers and functions." (Citing cases from numerous states.)

It has been held that a constitutional officer may not be legislated out of office. Such was the holding in the case of State ex rel. Kennedy v. Brunst, 1870, 26 Wis. 412, 7 Am.Rep. 84, where the court said:

"* * * It would certainly be a very idle provision of the constitution, to secure to the electors the right to choose their sheriffs, and at the same time leave to the legislature the power to detach from the office of sheriff all the duties and functions by law belonging to that office when the constitution was adopted, and commit those duties to some officer *not elected* by the people. For this would be to secure to the elec-

tors the right to choose a sheriff in name merely, while all the duties and substance of the office might be exercised by and belong to an officer appointed by some other authority. * * *" (Emphasis supplied.)

To make a free and independent constitutional officer subservient to the dictates of some appointive officer is equivalent to abolishing the office and creating another in lieu thereof to exercise the duties and functions belonging to the first office. It was long ago determined that the legislature has no power to take from a constitutional officer the substance of the office itself, and transfer it to another who is to be appointed in a different manner and will hold the office by a different tenure from that which is provided for by the constitution. Warner v. People ex rel. Conner, 1845, 2 Denio, 272, 43 Am.Dec. 740. A constitutional office cannot be destroyed nor an incumbent legislated out of it in the absence of express constitutional authority, State ex rel. Gaston v. Black, 1917, 199 Ala. 321, 74 So. 387, 388, and what may not be done directly cannot be accomplished by indirection.

We therefore conclude that this Act constitutes an abortive attempt to destroy the independent constitutional office of auditor and to such extent is unconstitutional.

The financial administration act of 1953 is the result on the part of the legislature of an attempt to comply with a mandate

from the people. In 1952 the legislature was investigating the advisability of enacting measures looking toward a complete reorganization of certain state offices and agencies including the fiscal affairs of the state. The legislature, by concurrent resolutions, adopted certain acts relating to reorganization and referred the same to the people. These acts sought the advice of the electors as to whether there should be created a department of law, a department of health and a department of finance. These bills were submitted to the electorate at the election held on November 4, 1952, and met with the approval of a majority of the qualified electors voting thereon. The referred measure which was adopted by the people relating to a department of finance is entitled

"An Act Relating to State Reorganization, and Providing for the Creation by the Legislature of a Department of Finance." Laws 1952, p. 384.

By Section 1 of the Act it was provided that

"The legislature shall enact legislation having for its purpose the creation of a department of finance to consist of the commissioner of finance, the board of finance, and such other officers, employees and divisions as the legislature may deem necessary or advisable."

In compliance with this mandate the legislature adopted the financial administration act of 1953. The title of the Act is as follows:

"An act relating to public finance; creating the department of finance; defining its powers and duties; providing for the co-ordination of state agencies administering public finance and budgeting and for the transfer of their powers and duties to the department of finance; abolishing certain agencies, and prescribing penalties; and declaring an emergency."

By the provisions of the Act it is apparent that a new, wide and comprehensive attempt was made looking toward a complete revision of the laws for administering the finances of the state.

To begin with, the Act creates a board of finance to consist of five members appointed by the governor, with the advice and consent of the senate, and to serve for terms of five years. Board members were to

"* * * be chosen for demonstrated ability in the field of business and financial management and interest in public affairs * * *." Sec. 5(a).

In addition to the board members provision was made for a commissioner of finance who was to

"* * * act as chief financial officer of the state, advise the governor and the legislature in matters relating to the financial affairs thereof and provide secretarial and other office serv-

ices required by the board of finance." Sec. 4(a).

This office was considered of such importance that provision was made for his appointment by the governor, with the advice and consent of the senate, to serve at the pleasure of the governor. He was required to be

"* * * possessed of a thorough knowledge of modern business methods, with not less than eight years experience in business and finance, of which at least five years shall have been spent in a responsible administrative capacity in a large business institution, and a part of which experience may have been obtained with a governmental institution. * * *" Sec. 4(b).

His salary was fixed at a sum not to exceed $9,600 per year.

To understand the comprehensive powers and duties vested in the board it is necessary to quote from the Act. Section 6 reads as follows:

Sec. 6. *"Powers and duties.*—(a) The board of finance shall exercise advisory, quasi-legislative and appeal functions relating to questions of policy arising in the administration of the fiscal affairs of the state, and shall: 1. Approve or disapprove; 1a. Applications for transfers from contingent appropriations to appropriations for state agencies; 1b. state depositories designated under the provisions of section 10–302; 1c. investment of public funds under the provisions of section 10–308, and 1d. budget estimates; 2. hear and determine appeals from any act or decision of the commissioner; 3. prescribe rules and regulations for the conduct of the work of the department, and, 4. hear and determine cases relating to the conduct of the business of the department.

"(b) In the exercise of any duty, power or function prescribed in subsection (a) the board of finance shall have the power to make or cause to be made, through the facilities of the department, any investigation or study desired to aid in the formulation of policies or to determine the wisdom and efficacy of any policy, plan or procedure in effect, and to report its finding and recommendations to the commissioner, the governor, and the legislature.

"(c) Not later than the first day of December in each year the board shall submit to the commissioner of finance a written report of the activities of the board, which shall be embodied in the annual report of the commissioner of finance."

In addition to the foregoing powers and duties it is provided in Section 7 of the Act that

"(a) Except as otherwise provided in this Act the board of finance shall succeed to and is vested with the duties and powers heretofore vested in and

imposed upon: 1. the governor, the state treasurer and the state auditor, in so far as they relate to the designation of depositories and the investment of public money, under the provisions of article 3, chapter 10, Arizona Code of 1939; 2. the loan commissioners, as provided by section 10–401, and, 3. the state certification board, as provided by section 75–447.

"(b) The loan commissioners of the state of Arizona and the state certification board are abolished."

In Section 8 of the Act it is provided that

"(a) The department of finance shall include *a division of accounts and control, a division of the budget, a division of purchases and property control,* and *a division of administrative services.* * * *"" (Emphasis supplied.)

Provision is then made that each of these divisions shall be administered by a director appointed by and serving at the pleasure of the finance commissioner, except that the division of accounts and control was to be presided over by the state auditor, designated "Controller", who

"* * * shall succeed to and is vested with the duties and powers heretofore vested in and imposed upon the state auditor and shall, under the supervision of the commissioner of finance, administer the division of accounts and control." Sec. 10(a).

This Act contemplated that the state auditor would be in the nature of an interim officer pending such time as a complete reorganization could be accomplished. The Act provided that

"Until and unless the constitution is so amended as to abolish the office of state auditor or to make valid its abolition by legislative enactment, the state auditor shall be deemed to be the controller and the provisions of this Act relating to the appointment of a controller and prescribing his qualifications, term of office and salary shall have no force or effect." Sec. 10(c).

Prior to the adoption of this financial administration act of 1953 the extensive duties of the auditor in administering the financial affairs of the state, including budget making, had been vested in the governor and the auditor under the provisions of the budget and financial administration act of 1943, A.C.A.Supp.1952, § 10–901,. et seq. By the provisions of this new Act, Sec. 11, there was created a division of the budget. This section provides that

"(a) The division of the budget shall succeed to and is vested with the duties and powers with respect to budgeting vested in the state auditor under the provisions of sections 10–903 to 10–911 inclusive of the budget and financial administration act of 1943.

"(b) In the performance of the duties and powers prescribed in subsection (a) the division shall: 1. Keep in continuous touch with the operations, plans and needs of state agencies and

with the sources and amounts of state revenue; 2. appraise the quantity and quality of services rendered by each state agency and the need therefor; 3. develop, in cooperation with each state agency, a comprehensive, long range plan for capital outlay consistent with means available for financing the same; 4. prepare the annual budget report, including statements relative to the justification of estimates and work schedules; 5. recommend appropriate transfers of appropriations; 6. examine and recommend to the commissioner of finance and the governor the approval of work programs and allotments to state agencies; 7. develop plans for improvements and economies in the organization and operation of state agencies, and install such as may be approved by the head of each state agency affected, or as may be directed by the governor or by law, and, 8. prescribe the form and, unless fixed by law, the dates of submission of operation reports by state agencies."

In addition to the budget director provision was made in Section 13 of the Act for the employment of

" * * * A budget technician, possessing qualifications to make management studies and to apply professional engineering knowledge and techniques to budget making, * * *."

As explained in the fore part of this opinion a complete and new approach was made with reference to the purchase of supplies and the acquisition of property required by the state and its many institutions. The Act sets up as a component part of the department of finance a division entitled "Division of purchases and property control". Its powers and duties are so vast that they may be best delineated by quoting from the Act. Section 14 provides:

"(a) Except as otherwise provided by this Act, the powers and duties of state agencies relating to the purchase of supplies are transferred to and vested in the division of purchases and property control.

"(b) The division of purchases and property control shall succeed to and is vested with the powers and duties vested in the state property condemnation board under the provisions of sections 4–318 and 4–319, Arizona Code of 1939, which board is, from and after the effective date of this Act, abolished."

Sec. 15. *"State purchasing agent.—* (a) The state purchasing agent, under the supervision of the commissioner of finance, shall be the governing officer of the division of purchases and property control. He shall possess extensive experience in management and administration of a business enterprise. or large governmental institution of sufficient size to incorporate integrated departmental functions. He shall pos-

sess a thorough knowledge of modern business methods as related to purchasing and management, with not less than seven years of responsible experience in business and/or governmental administration. He shall qualify by filing with the secretary of state an official bond in the sum of fifty thousand dollars, conditioned upon the faithful performance of his duties. Experience shall include organization and management, material and inventory control, and procurement policies and procedure. Two years of experience may be replaced by successfully completed college courses in business administration and/or public administration at the ratio of two years education for each year of experience.

"(b) The state purchasing agent shall appoint such assistants as may be necessary to carry out the purposes of this Act, assign their duties, and fix their compensation."

Sec. 16. *"Powers and duties.*—(a) The division of purchases and property control shall: 1. Establish and enforce standard specifications applicable to supplies, materials and equipment purchased for the use of state agencies; 2. lease grounds, buildings and office or other space required by state agencies; 3. transfer supplies to or between state agencies; 4. sell obsolete or unused supplies, and, 5. contract for and make rules and regulations governing repairs and alterations to equipment or buildings, and to other improvements on state buildings or grounds.

"(b) The division of purchases and property control shall: 1. purchase all supplies required by any state agency; 2. purchase all fuel, lights, water and other office and building services for state agencies; 3. cause to be made all repairs or structural replacements required for any state building; 4. supervise central storerooms and warehouses operated by the state; 5. maintain a current inventory of removable equipment and real property belonging to or under lease to the state or its agencies, except such as is administered by the state land department, showing the occupying agency, location both by legal description and metes and bounds, cost, and date of acquisition; 6. purchase, at the written direction of the governor, all real property, needed for state use, and, 7. negotiate all real and personal property insurance, and bond contracts.

"(c) Nothing in this section shall be construed to affect the powers and duties of any state agency with respect to the purchase and supply, production and distribution among state institutions, including supervision of use, of industrial or agricultural products produced by state institutions."

It is thus seen this Act provides that the state's chief purchasing and spending agen-

cy is this division of purchases and property control. The state purchasing agent in the performance of his duties would spend large sums of the state's monies. The Constitution of Arizona places a barrier on the spending of public funds. It is provided in Section 5 of Article 9 that

"* * * No money shall be paid out of the state treasury, except in the manner provided by law."

With reference to this provision this court, in Crane v. Frohmiller, 1935, 45 Ariz. 490, 495, 45 P.2d 955, 958, has pointed out that

"Provisions of this nature appear in many state constitutions, and they have universally been interpreted to mean that the people's money may not be expended without their consent either as expressed in the organic law of the state or by constitutional acts of the Legislature appropriating such money for a specified purpose. Dickinson v. Clibourn, 125 Ark. 101–105, 187 S.W. 909; People [ex rel. Hegwer] v. Goodykoontz, 22 Colo. 507, 45 P. 414; State [ex rel. Henderson] v. Burdick, 4 Wyo. 272, 33 P. 125, 24 L.R.A. 266. The rule is so well known and so generally accepted that no further citations are needed to support it."

In the case of Cockrill v. Jordan, 72 Ariz. 318, 235 P.2d 1009, 1010, Mr. Justice Udall, speaking for this court and of this constitutional prohibition, said:

"This has been construed to mean that no money can be paid out of the state treasury unless the legislature has made a valid appropriation for such purpose and funds are available for the payment of the specific claim. Eide v. Frohmiller, 70 Ariz. 128, 216 P.2d 726; Crane v. Frohmiller, 45 Ariz. 490, 45 P.2d 955."

Who determines whether a valid appropriation has been made for monies proposed to be expended and if funds are available for the payment of any specific claim and if for a public purpose? The answer is the state auditor provided for in the Constitution. Section 1, Article 5; Section 4–302, A.C.A.1939, as amended by Ch. 17, Laws 1951; Board of Regents of University, etc. v. Frohmiller, 69 Ariz. 50, 61, 208 P.2d 833.

By the provisions of the financial administration act of 1953 it was provided and contemplated that the controller, in the person of the state auditor, under the supervision of the commissioner of finance, would make all these determinations. We have previously shown that these duties belong to the constitutional office of auditor and not to the office of auditor as an adjunct of the board of finance.

We are firmly convinced that the division of purchases and property control cannot function for the reason that there is no officer to pre-audit all the claims that the division might attempt to authorize by its purchasing agent.

The constitutional inhibition contained in Section 5 of Article 9, supra precludes any

possibility of any of the state's monies being expended except as provided by law. The provisions of the law are that the state's monies can only be expended on claims audited by the constitutional auditor. By the provisions of this administration act of 1953, it was provided that the state's monies would be expended on the orders of its controller. The board of finance has no controller for as we have explained the office of state auditor is not available to it and the office can be no part of the department of finance.

This determination points up the conclusion that the sum ($167,950) appropriated for the support of the board of finance for the fiscal year 1953-4, in the general appropriation bill of 1953, subd. 85, Ch. 132, Laws of 1953, cannot be expended by the board.

Being mindful that the Act should be held constitutional if possible we have considered what authorization in law, if any, might be found for holding that the Act can function by *giving no heed* to provision in Section 10(a) that the auditor as controller shall be under the supervision of the commissioner in the administration of the division of accounts and control. Can we say that this matter of control is really not material and being immaterial can be overlooked? Assuming that it can be dismissed as a matter of no materiality, would a free and independent auditor fit into the general scheme of the Act and thus allow the Act to stand and the department to be activated?

Such a consideration on our part forces us to consider what was the purpose of the enactment of this law? On its face it is most apparent that it was voicing a whole new concept for the coordination of state agencies administering public finances. It came about, as above pointed out, by the people approving an act of the legislature entitled

### "An Act

"Relating to state reorganization, and providing for the creation by the legislature of a department of finance." Laws 1952, p. 384.

The Act, presenting a completely new approach, is geared to its own concepts and its integral parts are necessary for its functioning as it was contemplated. To us it seems clear that it cannot function without the services of its division of accounts and control which were, by the provisions of Section 9,

1. To keep the general accounts of the state and a summary of the financial transactions of all state agencies.

2. To prepare and submit to the commissioner of finance all accounting statements relating to

(a) the operation and condition of state funds,

(b) appropriations,

(c) reserves, and

(d) cost of operation of state government.

3. To pre-audit and certify as to the availability of funds for all commitments

for employment, purchase orders, contracts, etc., and

4. "[to] approve and settle all valid claims against the state and provide for the payment thereof by issuing warrants drawn upon state treasurer or other officer charged with the custody of state funds." Section 9(6).

These duties necessitate the exercise of discretion and guidance. Once exercised and adopted they provide the cornerstone of the entire structure. The heart of this department of finance is in its division of accounts and control. There is no basis or foundation for budgetary making and controls without the division of accounts and control. The duties prescribed for the division of the budget such as preparing the annual budget of the state of Arizona could not be performed without access to and *reliance* upon the records of the division of accounts and control.

The foregoing considerations demonstrate that the reorganization plan culminating in the creation of this department of finance is built around the central idea of a head with powers of command. All division heads are responsible to the commissioner of finance who in turn is responsible to the board. This reasoning leads us to the conclusion that making the controller (auditor) amenable to the supervision of the commission was intentional, and the subservience of the controller to the directions of the commissioner is absolutely necessary if the commanding officer is to be in a position of absolute control. The possibility of counter-commands or interdictions of such an inferior as the controller is unthinkable and would create chaos if made and permissible.

There is such an inseverability existing between the division of accounts and control, the division of the budget and the division of purchases and property control that without the division of accounts and controls the whole structure falls. Its removal destroys the law as a whole. Considering the over-all purpose of reorganization, with the centralization of power and command as evidenced in the whole Act, compels the conclusion that the legislature would not have enacted the Act without the division of accounts and control under the complete domination of the commissioner of finance. The Act anticipates the existence of a division of accounts and control independent of everyone except the commissioner, which would insure that the dominant aim of the statute could not be frustrated.

The severability clause contained in the Act is of no avail where the valid and invalid parts of a statute are inextricably entwined and so connected and interdependent in subject matter, meaning and purpose as to preclude the presumption that the legislature would have passed the one without the other, but, on the contrary, justify the conclusion that the legislature intended them as a whole and would not have enacted a part only. Such was our holding in Millett v. Frohmiller, 66 Ariz.

339, 188 P.2d 457. For a comparable application of the rule see Railroad Retirement Board v. Alton R. Co., 1934, 295 U.S. 330–392, 55 S.Ct. 758, 79 L.Ed. 1468, 1482.

As noted in the foregoing part of this opinion many additional attacks other than the one treated herein were leveled at the Act. In view of our conclusions that the Act as a whole is unenforceable and unconstitutional for the reasons stated, we do not deem it necessary to consider these other challenges.

The order heretofore made, directing the issuance of a peremptory writ of mandamus ordering the state treasurer to honor and pay the warrant issued by the state auditor, is confirmed.

STANFORD, C. J., and PHELPS, UDALL and WINDES, JJ., concur.