STATE of Minnesota ex rel. Robert W. MATTSON, Treasurer of the State of Minnesota, Petitioner,

v.

Peter J. KIEDROWSKI, Commissioner of Finance of the State of Minnesota, Respondent.

No. CX-85-1952.

Supreme Court of Minnesota.

Aug. 8, 1986.

Wayne Olson, Minneapolis, for petitioner.

Hubert H. Humphrey, III, Atty. Gen., Kent G. Herbison, Chief Deputy Atty. Gen., St. Paul, for respondent.

SCOTT, Justice.

Robert W. Mattson, Treasurer of the State of Minnesota, petitions this court to issue a writ of quo warranto to Peter J. Kiedrowski, State Commissioner of Finance, directing the Commissioner to cease and desist usurping the duties of the State Treasurer under the color of authority of Chapter 13 of the 1985 Minnesota Special Session Laws. Mattson contends that, as it relates to the State Treasurer's Office, Chapter 13 is unconstitutional in that it abolishes, in effect, his executive office. We agree and, accordingly, issue the writ to the Commissioner.[1]

In 1985, the legislature, in special session, enacted a statute, several provisions of which transferred most of the responsibilities of the State Treasurer, an executive officer, to the Commissioner of Finance, a statutory position. Act of June 27, 1985, ch. 13, § 13, 1985 Minn.Laws 2082.[2] The legislature, by this act, did not disturb the State Treasurer's position on the State Board of Investment, the composition of which is mandated in Article 11 of the Minnesota Constitution, nor did it strip the State Treasurer of the power, also prescribed in Article 11 of the constitution, to keep a separate record of the state bond fund. The legislature retained the State Treasurer's position on the State Executive Council, a body organized pursuant to state statute, and allowed the State Treasurer to receive a daily cash reconciliation report from the Commissioner of Finance. All other duties of the State Treasurer, however, were transferred to the Commissioner of Finance.

The duties the legislature transferred to the Commissioner included several functions relating to the receipt of state monies. Prior to the passage of Chapter 13, monies

---

1. Section 2 of Article VI of the Minnesota Constitution provides that this court shall have original jurisdiction in remedial cases that are prescribed by law. Minn.Stat. § 480.04 (1984) confers original jurisdiction on this court for the issuance of writs of quo warranto. We have used such powers in the past. *See, e.g., State ex rel. Palmer v. Perpich,* 289 Minn. 149, 182 N.W.2d 182 (1971); *State ex rel. Douglas v. Westfall,* 85 Minn. 437, 89 N.W. 175 (1902).

2. Section 13 of Chapter 13 provides, in part:

   Except as provided in the Minnesota Constitution, article V; article XI, sections 7 and 8; and Minnesota Statutes, sections 9.011; 11A.03; and 16A.27, subdivision 2, the responsibilities of the state treasurer are transferred to the commissioner of finance under Minnesota Statutes, section 15.039.

received by state agencies, which included tax revenues, federal aids, sales of services, debt instrument sales, and license plate fees, were batched together by the recipient agency and forwarded to the State Treasurer's Office, along with a tape calculation of the amount of the items in each batch. The State Treasurer issued a receipt to each agency that forwarded such batches and verified the total of each batch by recalculating the tape totals. The State Treasurer's Office recounted the cash in each batch to verify the agency's totals and placed the cash in the State Treasurer's statutory revolving fund. Checks found in the batches were not separately counted by the State Treasurer's Office; however, checks in the amount of $500,000 or more drawn on local banks were made available by the State Treasurer's staff for immediate investment. Deposits of such checks were made three times daily. The bank deposit slips were then fed into the State Treasurer's computer, which printed out trial balance reports. These trial balance reports were forwarded to the Department of Finance, which used such information for budget and accounting purposes.

Some of the monies received by state agencies were not forwarded to the State Treasurer, but were directly deposited in private banking institutions. The State Treasurer, however, received the monthly statements of these and all other bank accounts and reconciled the bank statements with records compiled by his staff. These reconciliation reports were then balanced against information kept by the Department of Finance. The State Treasurer also opened all of the state's accounts with private banking institutions, which were designated by the State Executive Council as depositories of state funds. The State Treasurer's Office also approved the collateral pledged by custodian banks.

Apart from these functions relating to the receipt of state monies, the legislature, in Chapter 13, transferred from the State

Treasurer's Office authority over the disbursement of some state funds. Prior to the act, the State Treasurer verified payments of some state funds to private vendors and state employees. As warrants were presented by individual banking institutions for payment, the State Treasurer compared the amounts of the warrants to information forwarded by the Department of Finance. Warrants not consistent with the State Treasurer's computer data were not honored. Any corrections or adjustments were made by the State Treasurer, who then directed the payment of the warrants. In addition, the State Treasurer had responsibility for determining the amount of state funds available for investment. The State Treasurer's decision was typically based on the amount of state funds in private banking institutions, as well as information forwarded by the Department of Finance. Two or three times each day the State Treasurer notified the staff of the State Board of Investment of the amount of funds available for investment. The Board decided how to invest the funds and the State Treasurer then distributed the funds in accordance with the Board's wishes. Prior to Chapter 13, the State Treasurer also managed the debt service function on all state bond issues, regularly calculating the amount of payments of principal and interest and directing payment on the due dates.

In addition to the transfer of duties, the legislature, in Chapter 13, transferred several positions from the State Treasurer's Office to the Department of Finance. Currently, nine employees perform duties in the Department of Finance similar to those they previously performed in the State Treasurer's Office. The legislature assigned three full-time employees and one part-time employee to the reorganized State Treasurer's Office and abolished seven and one-half positions that were, prior to Chapter 13, assigned to the State Treasurer's Office.[3]

---

**3.** Prior to July 1, 1985, the effective date of Chapter 13, the State Treasurer's Office employed 17 people: the State Treasurer; a deputy

state treasurer; a fiscal activities officer; an executive secretary; a senior accounting officer; a clerk-typist; two senior accounting clerks; an

On October 17, 1985, the State Treasurer petitioned this court for a writ of quo warranto, contending that the legislature's transfer of his office's duties and positions was unconstitutional. We remanded the proceeding to the Ramsey County District Court for findings of fact. In district court, the State Treasurer and Commissioner of Finance stipulated to facts concerning the transfer of duties and positions, and the district court incorporated the stipulated facts into its final findings of fact, dated March 18, 1986.

Afforded with these findings of fact, we are now asked to determine the constitutionality of Chapter 13 of the 1985 Minnesota Special Session Laws as it relates to the State Treasurer's Office.

Our state constitution, in Article III, discusses the distribution of the powers of state government. It provides:

> The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution.

Minn. Const. art. III, § 1. Article V of the constitution establishes the executive department of state government. It states that the department shall consist of a governor, lieutenant governor, secretary of state, auditor, treasurer and attorney general, all of whom are to serve at the will of the electorate. Minn. Const. art. V, § 1. Although Article V prescribes the terms of each of the offices, it does not expressly detail, with the exception of the governor, the duties of the officers. Section 4 of Article V merely provides: "The duties and salaries of the executive officers shall be prescribed by law." [4]

The provision in Article V providing that the duties of the state executive offices "shall be prescribed by law" is present in several other state constitutions. Appellate courts in these jurisdictions have consistently held that the prescribed-by-law provision does not allow a state legislature to transfer inherent or core functions of executive officers to appointed officials.

The Arizona Supreme Court, in *Hudson v. Kelly*, 76 Ariz. 255, 263 P.2d 362 (1953), held that a state statute that transferred duties of the state auditor, an executive officer, to the state controller, an appointed official, was unconstitutional. Although the duties of the state auditor were not detailed in the constitution, the Arizona court noted that at the time of the adoption of the state constitution the term "state auditor" was commonly understood to connote a person who was an accountant of the state. These accounting duties, which constituted the core function of the constitutional office, could not be transferred to an appointed officer. The Arizona court noted:

> In the instant case it appears that the legislature should have known that it

---

EDP operations technician; a data entry operator; two cashiers; an EDP operations supervisor; a senior accounting technician; a senior accounting clerk; an office services supervisor; and an executive. In addition, three positions were assigned to the State Treasurer's Office, positions that were vacant on July 1, 1985. Of these 20 positions that comprised the State Treasurer's Office on June 30, 1985, 9 were transferred to the Finance Department and 3½ positions were assigned to the reorganized State Treasurer's Office: the state treasurer; an executive assistant principal, a fiscal activities officer and a part-time executive secretary. Accordingly, 7½ positions were abolished by Chapter 13, although Section 13 of the law states that 7 positions in the office were abol-

ished. *See* Act of June 27, 1985, ch. 13, § 13, 1985 Minn.Laws 2082.

In addition to the abolition and transfer of positions, the legislature, in Chapter 13, reduced the State Treasurer's budget from $584,600 appropriated for FY (fiscal year) 1985 (*see* Act of June 8, 1983, ch. 301, § 12, 1983 Minn.Laws 1568), to $162,600 appropriated for FY 1986. For FY 1987, $163,700 was appropriated. *See* Act of June 27, 1985, ch. 13, § 13, 1985 Minn. Laws 2082.

4. This language is from the Revised State Constitution of 1974. The corresponding provision in the original Constitution of 1857 (article V, section 5) stated: "And the further duties and salaries of said executive officers shall each thereafter be prescribed by law."

could not denude the office of its inherent powers and duties, even though they had been prescribed by statute, and leave the office as an empty shell. Such attempts have uniformly been denounced by courts of last resort.

*Id.* at 265, 263 P.2d at 368.

The California Supreme Court, in *Love v. Baehr*, 47 Cal. 364, 367–68 (1874), stated:

It is admitted that the Constitution contains no express limitation on the power of the Legislature in this particular. But we think a limitation is necessarily implied from the definition of the office. From the earliest period of our history as a nation, almost every State in the Union had a Secretary of State, Controller, Treasurer, and Attorney-General; and the general nature of the duties pertaining to each were perfectly well known to the framers of our Constitution. It is clear beyond controversy, that in establishing similar offices here, the framers of that instrument had reference to the same general class of duties, which it was well known pertained to such offices elsewhere.

The Illinois Supreme Court noted in *American Legion Post No. 279 v. Barrett*, 371 Ill. 78, 91, 20 N.E.2d 45, 51 (1939):

It is a rule frequently stated by this court, that the General Assembly may not take away from a constitutional officer the powers or duties given him by the constitution. The constitution, by section 1 of article 5 provides that public officers, including the State Treasurer, shall perform such duties as may be required by law. Nothing in the constitution further defines the duties of the State Treasurer. This court has held that those duties are such as are to be implied from the nature of the office and of them he may not be deprived or relieved.

(Citations omitted.)

The Supreme Court of North Dakota noted in *Ex Parte Corliss*, 16 N.D. 470, 476–77, 114 N.W. 962, 965 (1907):

We do not deny the power of the Legislature to prescribe duties for these officers, which power carries with it by implication the right to change such duties from time to time as the public welfare may demand; but we deny its power to strip such offices, even temporarily, of a portion of their inherent functions and transfer them to officers appointed by central authority.

■ These decisions of other jurisdictions are not, of course, binding on us in this case. They do, however, represent a majority position on the issue presented to us here. We conclude that the determination of these courts that state executive officers possess core functions applies equally to our own state constitutional framework of the executive department.

Under the prescribed-by-law provision of Article V, the legislature has the authority to prescribe duties for the executive officers, and this authority includes the power to change, from time to time, such duties as the public health and welfare demand. Indeed, since the time of statehood the legislature has changed the duties of state executive officers, including those of the State Treasurer. In 1858, for example, the legislature required that the State Treasurer "safely keep all public moneys." Act of August 12, 1858, ch. 59, § 2, 1858 Minn. Laws 136. In 1874, however, the legislature enacted a law providing for the transfer of the state depository from the State Treasurer's Office to depository accounts in private banking institutions, such institutions to be designated by the State Treasurer. Act of March 9, 1874, ch. 11, § 1, 1874 Minn.Laws 125–26. In 1901, the legislature created a board of deposit to designate the banking institutions in which state funds were to be deposited. Act of April 4, 1901, ch. 140, § 2, 1901 Minn.Laws 176. The 1925 legislature transferred this duty of the board of deposit to a newly-created executive council, of which the State Treasurer was a member. Act of April 25, 1925, ch. 426, art. II, 1925 Minn.Laws 756–57.

■ It is argued that, like the statutes that have previously changed the duties of the State Treasurer, Chapter 13 is a valid

exercise of the legislature's power to change the duties of state executive officers in light of public health and welfare demands. We cannot agree. The previous statutes changing the duties of the State Treasurer, including the comprehensive 1973 act creating the Department of Finance, *see* Act of May 21; 1973, ch. 492, 1973 Minn.Laws 1081 (codified at Minn. Stat. § 16A.01–.80 (1984)), merely modified certain functions of the State Treasurer's Office. Chapter 13 goes much further. It transfers all of the State Treasurer's independent power over the receipt, care and disbursement of state monies, functions that constitute the very core of the office.

Functions relating to the receipt, care and disbursement of state monies define the treasurer position and separate it from the other executive offices of state government established in our constitution. In creating the office in Section 1 of Article V, the drafters of our constitution must have had these core functions in mind, for nearly every state in the union in 1857 had a state treasurer and the nature of the duties pertaining to the office was well-known.

■ Although the prescribed-by-law provision of Article V affords the legislature the power, in light of public health and welfare concerns, to modify the duties of the state executive officers, it does not authorize legislation, such as Chapter 13, that strips such an office of all its independent core functions. The mandate in Section 1 of Article V, that the executive department consist of a governor, lieutenant governor, secretary of state, auditor, treasurer and attorney general, implicitly places a limitation on the power of the legislature, under Section 4 of Article V, to prescribe the duties of such offices. The limitation is implicit in the specific titles the drafters gave to the individual offices.[5]

This is not to say that the legislature could not name officials to perform some of the core functions of an executive office;

core functions of such offices can be shared with statutory officials. The limitation implicit in Section 1 of Article V serves only to prevent the legislature from abolishing all of the independent functions inherent in an executive office. To allow the legislature to abolish all such functions of an executive office is to allow it to do violence to the title the drafters afforded the office and the core functions necessarily implied therefrom.

■ Rather than conferring all executive authority upon a governor, the drafters of our constitution divided the executive powers of state government among six elected officers. This was a conscious effort on the part of the drafters, who were well aware of the colonial aversion to royal governors who possessed unified executive powers. In granting the legislature the power to prescribe the duties of such executive officers in Article V, the drafters could not have intended to afford the legislature the power to abolish these offices by statute. In Article IX, the drafters enumerated the only procedure by which such offices could be eliminated: the constitutional amendment process. By statutorily abolishing all of the independent core functions of a state executive office, the legislature, in effect, abolishes that office, and the will of the drafters, as expressed in Article IX, is thereby thwarted.

Admittedly, the State Treasurer still has some miscellaneous duties under Chapter 13. He is a member of the State Executive Council and the State Board of Investment. He also is required to keep a separate record of the state bond fund, although this duty may be somewhat difficult to carry out in light of the fact that most, if not all, of the financial information formerly kept by the State Treasurer's Office has been transferred to the Department of Finance. These very minor duties aside, there is little doubt that the Office of State Treasurer now stands as an empty shell.

---

5. The first legislature, meeting in 1858, was well aware of the functions inherent in any treasurer position. In prescribing the duties of the office, it stated that the State Treasurer was to "keep an accurate account of the receipts and disbursements at the treasury * * *." Act of August 12, 1858, ch. 59, § 6, 1858 Minn.Laws 137.

Although the office has never been a major policy-making position, it did, prior to the effective date of Chapter 13, encompass independent functions relating to the receipt, care and disbursement of state monies; its core functions were left intact.

We must give meaning to Section 1 of Article V, as well as Article IX. We stated in *State ex rel. Chase v. Babcock*, 175 Minn. 103, 107, 220 N.W. 408, 410 (1928): "The rules governing the courts in construing articles of the State Constitution are well settled. The primary purpose of the courts is to ascertain and give effect to the intention of the Legislature and the people in adopting the article in question." To permit the legislature to gut an executive office as it did in Chapter 13 is to hold that our state constitution is devoid of any meaningful limitation on legislative discretion in this area.

It is evident from the legislative history of Chapter 13 that the provision transferring most of the functions and positions of the State Treasurer's Office to the Department of Finance was not a product of serious discussion of the role of a state treasurer in modern state government. No constitutional study was commissioned, as has been done in the past,[6] nor were any data gathered on the financial operations of state government and the state treasurer's role, if any, in that process.[7] It appears that Chapter 13 was precipitated by the actions of the individual occupying the state treasurer position. The individual, however, was duly elected by the people of this state in accordance with Article V of our state constitution. If the individual occupying the office should be removed, the legislature has at its disposal the impeachment process of Article VIII. If the position is no longer warranted for the efficient administration of state government, the legislature can present to the people, in accordance with Article IX, a constitutional amendment eliminating the office. The drafters did not, however, give the legislature the option of statutorily abolishing this state executive office. Such a remedy lies only with the people.

■ We hold that Chapter 13, as it relates to the State Treasurer, violates Section 1 of Article V and Section 1 of Article IX of the Minnesota Constitution. The functions and positions of the State Treasurer's Office that were transferred by the 1985 act to the Department of Finance are to be returned to the State Treasurer and the funds appropriated to the Department of Finance for such transferred functions and positions are to be added to the appropriation of the State Treasurer's Office for the fiscal year 1987.[8]

Let the writ issue.[9]

YETKA and SIMONETT, JJ., concur specially.

YETKA, Justice (concurring specially).

I concur in the majority decision and agree that, having decided the case on the division of powers doctrine, it is not necessary to decide the second issue, namely, whether Chapter 13 special laws of 1985 violates Minn. Const. art. IV, § 17, which states: "No law shall embrace more than one subject, which shall be expressed in its title."

This court should, and has, extended great deference to the legislature and has indicated that this provision should be liberally construed in favor of upholding the constitutionality of an act.

---

**6.** A constitutional study commission was formed in the early 1970's to propose changes to the 1857 state constitution. A similar commission was created in 1945.

**7.** Such a study was conducted in 1971 to analyze the financial operations of the state. The result of this study was the creation of the Department of Finance in 1973. *See* Act of May 21, 1973, ch. 492, 1973 Minn.Laws 1081.

**8.** For fiscal year 1987, $373,300 was appropriated to the Department of Finance to cover the cost of such transferred functions and positions.

**9.** Because we issue the writ based on our conclusion that the statute violates Minn. Const. art. V, § 1, and Minn. Const. art. IX, we need not discuss the other challenges to the statute raised by the State Treasurer.

Early cases decided in the 19th century explain the purpose of the aforesaid provision in the constitution. The function of the title requirement is to provide notice of the interest likely to be affected by the law in order to prevent surprise and fraud upon the people and the legislature so that provisions in a bill are not written in such a way that the title gives no suggestion of the nature of the proposed legislation. *See Johnson v. Harrison,* 47 Minn. 575, 50 N.W. 923 (1891). We have also set out the reason behind the requirement that each law embrace but a single subject. In *State v. Cassidy,* 22 Minn. 312 (1875), we said:

The well-known object of this section of the constitution, which declares that "no law shall embrace more than one subject, which shall be expressed in its title," was to secure to every distinct measure of legislation a separate consideration and decision, dependent solely upon its individual merits, by prohibiting the fraudulent insertion therein of matters wholly foreign, and in no way related to or connected with its subject, and by preventing the combination of different measures, dissimilar in character, purposes and objects, but united together with the sole view, by this means, of compelling the requisite support to secure their passage.

*Id.* at 322.

For years following these earlier decisions, the legislature stayed within these restraints; however, beginning with post-World War II, the legislature was faced with an increasing volume of business and an inability to complete its work within a legislative session. It commenced almost regular special sessions, and it was then that large tax and appropriation measures in conference committees began to have different provisions added thereto. Although the legislature did, for a time, at least in tax and appropriation conference committees, attempt to restrict amendments to revenue-raising or appropriation matters, even though those matters may not have risen on the floor of either house, now all bounds of reason and restraint seem to have been abandoned. For exam-

ple, Chapter 13, the subject of this appeal, is an act which contains 378 sections and is 273 pages long. Its title alone covers two pages. It deals with a number of disparate subjects: appropriation provisions, a section creating a council on Asian-Pacific Minnesotans, a section dealing with the revisor of statutes, one relating to agricultural land, one containing amendments to the Minnesota Zoological Garden, one establishing an Aspen recycling program, and many others. In *Johnson v. Harrison,* 47 Minn. at 577, 50 N.W. at 924, we said: "[A]ll matters treated of should fall under some one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be parts of, or germane to, one general subject." It is very difficult to see how this act complies with that restraint. We can certainly visualize, in modern life with the complexity of the legislation appearing before the legislature, the necessity of tax conference committees to consider many different revenue-making measures to balance the budget properly. We can visualize the same situation occurring in appropriations where last-minute measures may come up where it is necessary to amend the bill to provide for matters left unattended, but to add matters totally unrelated to either taxes or appropriations seems to me a clear violation of the constitution which this court should not tolerate. The worm that was merely vexatious in the 19th century has become a monster eating the constitution in the 20th.

Perhaps this court has been far too lax in permitting the slippage to occur or perhaps the right case had not yet reached this court until now. It is noteworthy that none of the parties has asked us to declare Chapter 13 unconstitutional in its entirety. Even the treasurer asked that only that portion dealing with the abolishment of his office should be so declared. It does seem to be particularly offensive that the legislature would attempt to all but demolish the treasurer's office not by a constitutional amendment or even by separate statute, but, rather, by resorting to the use of a

section of a so-called garbage or Christmas tree bill to do so.

Parties refer to Chapter 13 as a garbage bill. This designation has been given to that type of legislation where, near the tail end of a session, a group of individual ideas will be combined into one bill to wrap up the legislative business to avoid acting separately on each. A Christmas tree bill has normally been referred to, in legislative jargon, as a bill so drafted as to give a number of legislators approval of their separate or pet projects in order to gather sufficient votes to pass it. It seems to me that Chapter 13 presents all the objections that the constitution originally intended to prohibit. It contains a number of proposals which, if voted upon separately, might have failed and encourages votes from those who strongly support some features, but might oppose others. It all but bribes members of the public, as well as public officials, to support the measure in order to see their proposals result in fulfillment.

What then should our answer be? Have the courts also been blinded by features contained in various garbage or Christmas tree bills or simply has not the proper challenge come before us? I hope it is the latter and not the former. Regardless, we should send a clear signal to the legislature that this type of act will not be condoned in the future. Garbage or Christmas tree bills appear to be a direct, cynical violation of our constitution and however enticingly they may be drafted and whatever promises they may contain, we must have the will and the courage to resist the temptation to affirm the legislative action. It is clear to me that the more deference shown by the courts to the legislature and the more timid the courts are in acting against constitutional infringements, the bolder become those who would violate them. The courts of this nation and of the state were uniquely given the authority to prohibit infringements by either the legislative or executive branch of the government of constitutional rights vested in the people and denied those branches of the government. If we do not act to protect the public, who will? It is our constitutional duty to do so. It has been said that former President Harry S. Truman had a plaque on his desk which said: "The buck stops here." We would do well to follow his example.

While we recognize that modern times require modern methods of legislating, it was never intended by our founding fathers that the legislature be able to combine into one act a number of totally unrelated subjects. Thus, we should publicly warn the legislature that if it does hereafter enact legislation similar to Chapter 13, which clearly violates Minn. Const. art. IV, § 17, we will not hesitate to strike it down regardless of the consequences to the legislature, the public, or the courts generally. After all, the legislature has, within its given powers, the right to prepare proper constitutional amendments to submit to the people if it finds that existing constitutional restraints offer severe impediments to its ability to perform efficiently, but it should not and cannot be given the fiat to ignore the constitution, for then we will surely have despotism, a tyranny the founders sought to prevent—a system not of laws, but of men.

SIMONETT, Justice (concurring specially).

I join in the special concurrence of Justice Yetka.