[Cite as *Collins v. State*, 2025-Ohio-4347.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Christina Collins et al., | : | |
| Plaintiffs-Appellants, | : | No. 24AP-388 |
| | | (C.P.C. No. 23CV-6611) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| State of Ohio et al., | : | |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on September 16, 2025

**On brief:** *Democracy Forward Foundation, Madeline H. Gitomer, Sarah R. Goetz, Benjamin Seel, Victoria S. Nugent, and Emma R. Leibowitz*; and *UB Greensfelder LLP, Amanda Martinsek, Katherine M. Poldneff*, and *Ryan W. Gillespie*, for appellants. **Argued:** *Madeline H. Gitomer*.

**On brief:** *Shumaker, Loop & Kendrick, LLP, Mark D. Wagoner, Jr., David F. Axelrod*, and *Krystina E. Garabis*, for appellees. **Argued:** *Mark D. Wagoner, Jr.*

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Plaintiffs-appellants, Christina Collins ("Dr. Collins"), Michelle Newman, Stephanie Eichenberg, and the Board of Education of the Toledo City School District (collectively, "appellants"), appeal from a judgment of the Franklin County Court of Common Pleas granting the Civ.R. 12(B)(6) motion filed by defendants-appellees, State of Ohio and Governor Mike DeWine (collectively, "defendants"). For the reasons that follow, we affirm.

## I. Facts and Procedural History

{¶ 2} On September 19, 2023, Dr. Collins, Michelle Newman, Teresa Fedor, Kathleen Hofmann, Tom Jackson, Meryl Johnson, and Antoinette Miranda (collectively,

"original plaintiffs"), filed a complaint against defendants seeking declaratory and injunctive relief. The original plaintiffs asked the trial court to find certain provisions of 2023 H.B. 33, the state's biennial budget bill for fiscal years 2024 through 2025, unconstitutional. The challenged provisions of H.B. 33 fundamentally reorganized education governance in Ohio.

{¶ 3} The Ohio Constitution provides there "shall be a state board of education which shall be selected in such manner and for such terms as shall be provided by law" and "a superintendent of public instruction, who shall be appointed by the state board of education." Ohio Const., art. VI, § 4. The state board of education is currently comprised of 19 members; 11 members are elected while 8 members are appointed by the governor. The constitution states the respective "powers and duties of the board and of the superintendent shall be prescribed by law." Ohio Const., art. VI, § 4.

{¶ 4} Prior to the enactment of H.B. 33, the state board of education exercised "general supervision the system of public education in the state" and "exercise[d] policy forming, planning, and evaluative functions for the public schools of the state." Former R.C. 3301.07(A). H.B. 33 created the department of education and workforce ("DEW") and the director of education and workforce ("director"). R.C. 3301.13(A). The director is appointed by the governor, with the advice and consent of the senate, and serves as the head of the DEW. R.C. 3301.13(A). H.B. 33 transferred all "powers and duties regarding primary, secondary, special, and career-technical education granted to the state board, the state superintendent, or the former department of education, as prescribed by law in effect prior to the effective date of this section," except for certain enumerated duties, to the director. R.C. 3301.13(C). Thus, following the effective date of H.B. 33, the director would exercise "general supervision of the system of public education in the state" as well as "policy forming, planning, and evaluative functions for the public schools of the state," rather than the state board of education. R.C. 3301.07.[1]

---

[1] Among others, H.B. 33 expressly transferred the following powers and duties from the state board of education to the director: the power to "exercise leadership in the improvement of public education in this state, and administer the educational policies of this state relating to public schools, and relating to instruction and instructional material, building and equipment, transportation of pupils, administrative responsibilities of school officials and personnel, and finance and organization of school districts, educational service centers, and territory"; the power to "develop a standard of financial reporting which shall be used by each school district board of education"; the power to "administer and supervise the allocation and distribution of all state and federal funds for public school education"; the power to "formulate and prescribe minimum standards to be applied to all elementary and secondary schools in this

{¶ 5} H.B. 33 provided the state board of education would remain responsible for the "adoption of requirements for educator licensure, licensee disciplinary actions, [and] school district territory transfer determinations." R.C. 3301.111(A). H.B. 33 also required the state board of education to "make recommendations to the director of education and workforce regarding priorities for primary and secondary education." R.C. 3301.111(B).

{¶ 6} H.B. 33 was introduced in the Ohio House of Representatives on February 15, 2023. The as-introduced version of H.B. 33 did not include the challenged provisions regarding education governance. The House passed its version of H.B. 33 on April 26, 2023. After H.B. 33 was introduced in the Ohio Senate, the Senate amended H.B. 33 to include the challenged provisions. The Senate passed its version of H.B. 33, containing the challenged provisions, on June 15, 2023. On June 30, 2023, H.B. 33 passed the General Assembly. Governor DeWine signed H.B. 33 into law on July 4, 2023. The challenged provisions of H.B. 33 went into effect on October 3, 2023.

{¶ 7} The original plaintiffs were all members of the state board of education and claimed they had standing because H.B. 33 stripped them of "nearly all of [their] official duties and responsibilities as [] member[s] of the Board and reassign[ed] them to the Director of Education and Workforce." (Compl. at ¶ 17-23.) Two of the original plaintiffs, Dr. Collins and Ms. Newman, also alleged they had standing to bring their claims because they were parents of children who attended public school in Ohio. The original plaintiffs hired their own private counsel to represent them.

{¶ 8} On September 20, 2023, the original plaintiffs filed a motion for temporary and preliminary injunctive relief. Following a September 21, 2023 hearing, the trial court granted the original plaintiff's a temporary restraining order ("TRO"), restraining defendants from implementing or enforcing the challenged provisions of H.B. 33. The court referred the case to a magistrate for a hearing on the motion for preliminary injunction.

---

state," including standards for teachers to "be licensed by the state board of education" and the requirements for students' "promotion from grade to grade"; and the duty to prepare and submit to the director of budget and management "the biennial budgetary requests of the department and its divisions and for the public schools of the state." R.C. 3301.07(B)(1), (B)(2), (C), (D)(2), and (G). *See also* R.C. 3301.12(A)(1) through (6) (transferring the powers and duties of the superintendent of public instruction to the director).

{¶ 9}   On September 27, 2023, Ohio Attorney General ("AG") Dave Yost, through the AG's Chief Counsel and Ethics Officer Bridget C. Coontz ("Counsel Coontz"), moved to substitute as counsel for the original plaintiffs.  The AG noted R.C. 109.02 made the AG "the 'chief law officer for the state and all its departments,' " and prohibited state officers from being " 'represented by[] other counsel or attorneys at law.' " (Sept. 27, 2023 Mot. to Substitute at 1, quoting R.C. 109.02.)  As such, the AG claimed the original plaintiffs' private counsel had "no legal authority to represent the Ohio State Board of Education Members in their official capacities as State of Ohio Board Members."  (Mot. to Substitute at 1.)  The original plaintiffs opposed the AG's motion, noting that substituting the AG would create "an irreconcilable and un-waivable conflict," because the AG would then "represent[] all parties to this adversarial lawsuit."  (Sept. 28, 2023 Resp. in Opp. at 1.)

{¶ 10} On September 29, 2023, at 1:08 p.m., the trial court granted in part the AG's motion to substitute as counsel.  The court substituted Counsel Coontz as counsel for the original plaintiffs with respect to the claims they asserted in their capacity as members of the state board of education.  With respect to Dr. Collins and Ms. Newman "and their claim of standing as parents of children in Ohio public schools," the court determined original plaintiffs' private counsel "[would] be permitted to continue their representation of Collins and Newman as to those specific claims."  (Sept. 29, 2023 Entry at 3-4.)  At 2:03 p.m. on September 29, 2023, Counsel Coontz filed a Civ.R. 41(A) notice of dismissal, dismissing the claims filed by the original plaintiffs "in their capacity as State of Ohio Board of Education Members."  (Sept. 29, 2023 Civ.R. 41(A) Notice of Dismissal.)[2]  The original plaintiffs did not attempt to appeal the court's substitution of counsel order.

{¶ 11} On October 1, 2023, appellants filed an amended complaint asserting the following claims: Count 1 - a declaratory judgment that H.B. 33 violated the single subject rule in Article II, Section 15(D) of the Ohio Constitution; Count 2 - a declaratory judgment that H.B. 33 violated the three readings rule in Article II, Section 15(C) of the Ohio

---

[2] Subsequently, on October 9, 2023, the trial court disqualified Counsel Coontz from any further participation in the case. The disqualification resulted from an October 3, 2023 email Counsel Coontz sent to defendants' counsel, Assistant AG Julia Pfeiffer, in which Counsel Coontz "offered legal advice to Counsel Pfeiffer, which was directly adverse to Plaintiffs Collins and Newman, who Coontz represented in this case." (Oct. 9, 2023 Decision & Entry at 3-4.) Although Counsel Coontz previously dismissed the state board members' claims, the court found disqualifying Counsel Coontz was not a moot issue because the Civ.R. 41(A) dismissals were without prejudice, "meaning that the official-capacity claims could be reasserted within one year." (Oct. 9, 2023 Entry at 5.)

Constitution; Count 3 - a declaratory judgment that H.B. 33 violated Article VI, Section 4 of the Ohio Constitution; and Count 4 - an injunction enjoining defendants from enforcing the challenged provisions of H.B 33.[3]  Appellants noted Dr. Collins, Ms. Newman, and Ms. Eichenberg were all parents of children who attended public schools in Ohio (collectively, "Parent Plaintiffs"), and that the Board of Education of the Toledo City School District was a political subdivision that oversaw Toledo Public Schools ("TPS Board"). Appellants claimed the challenged provisions of H.B. 33 "unconstitutionally divest[ed] the State Board of its role supervising education in Ohio" and caused them to "los[e] their voice and their right to elect representation to the State Board to oversee and fight for their children's public-school education."  (Oct. 1, 2023 Am. Compl. at ¶ 140, 169.)

{¶ 12}  Ms. Eichenberg and the TPS Board joined Dr. Collins' and Ms. Newmans' motion for a preliminary injunction.  Following an October 2, 2023 hearing, the magistrate issued a decision recommending the trial court deny the motion for preliminary injunction. On October 20, 2023, the trial court issued an interim order adopting the magistrate's decision, denying the motion for preliminary injunction, and dissolving the TRO.  Both parties filed objections to the magistrate's decision.

{¶ 13}  On October 16, 2023, defendants filed a Civ.R. 12(B)(6) motion to dismiss the amended complaint.  Defendants alleged appellants lacked standing to pursue their claims and failed to state a claim for relief on the merits.  Appellants filed a response in opposition to defendants' motion to dismiss on November 17, 2023.

{¶ 14}  On May 24, 2023, the trial court issued a decision and entry granting defendants' motion to dismiss.  The court concluded appellants lacked standing to pursue their claims because their alleged injury, "a loss of 'meaningful, transparent, publicly accessible representation' with elected members of the State Board of Education [] could be asserted by any individual or entity: taxpayer or not, parent or not, school board or not." (May 25, 2024 Decision & Entry at 6.)  Because appellants' alleged injury was a generalized grievance, the court found appellants did not have standing to bring any of their claims.

---

[3] Although appellants designated Count 4 of their amended complaint as a "claim" for injunctive relief, we note that "[i]n general, injunctive relief is a remedy, not a cause of action." *Bresler v. Rock*, 2018-Ohio-5138, ¶ 45 (10th Dist.). *Accord Woods v. Sharkin*, 2022-Ohio-1949, ¶ 70 (8th Dist.) (noting "injunctive relief is a remedy, not a cause of action"). " 'A party is not entitled to an injunction absent an order for relief, to which he is entitled only after demonstrating a basis for his claim for relief.' " *MWL Enters., L.L.C. v. Mid-Miami Invest. Co.*, 2021-Ohio-1742, ¶ 37 (2d Dist.), quoting *Lowry v. Cox*, 1992 Ohio App. LEXIS 5825, *3 (2d Dist. Nov. 16, 1992).

The court further held that, even if it were to assume appellants had standing with respect to Counts 1 and 2 of the amended complaint, the court would still dismiss Count 3 of the amended complaint. The court concluded appellants failed to state a claim for relief on the merits of Count 3 because H.B. 33 did not abolish the state board of education. The court also found appellants lacked standing with respect to Count 3 because the only party with standing to "assert an alleged injury to the State Board of Education [was] the State Board of Education." (Decision at 10.) The court granted defendants' motion to dismiss for lack of standing and denied all outstanding motions and objections as moot.

## II. Assignments of Error

{¶ 15} Appellants appeal, assigning the following errors for our review:

> **Assignment of Error No. 1:** The trial court erred by concluding that Appellants failed to allege concrete, particularized injuries different in character from any injury suffered by the general public, where Appellants specifically alleged that H.B. 33 harms their ability to rely on a State Board of Education that represents Appellants' specific, local interests, works with them to improve their children's and students' schools, and conducts policymaking publicly and openly, and where the Magistrate Judge held that Appellants' alleged injuries, if proven, "amount to direct harm" and "are unique to Plaintiffs and not experienced by the general public."

> **Assignment of Error No. 2:** The trial court erred by finding that Appellants (1) failed to allege facts sufficient to state a claim in Count III of their Amended Complaint (that H.B. 33 violated Article VI, Section 4 of the Ohio Constitution, establishing the State Board of Education), even though questions about the ambiguity of constitutional text are legal questions that need not be alleged in the Complaint and require an analysis of voter understanding at the time of ratification; and (2) lacked standing to pursue Count III because only the State Board of Education itself has standing to sue under this clause, even though the clause is not so limited and Appellants asserted injuries unique to them as parents and a local school board.

## III. First Assignment of Error: Standing

{¶ 16} In their first assignment of error, appellants assert the trial court erred by finding they failed to allege concrete, particularized injuries sufficient to support standing. " 'Standing' is defined at its most basic as 'a party's right to make a legal claim or seek

judicial enforcement of a duty or right.' " *Ohio Pyro, Inc. v. Ohio Dept. of Commerce*, 2007-Ohio-5024, ¶ 27, quoting *Black's Law Dictionary* (8th Ed. 2004). "Before an Ohio court can consider the merits of a legal claim, the person or entity seeking relief must establish standing to sue." *Id.* Accord *State ex rel. Ohio Gen. Assembly v. Brunner*, 2007-Ohio-3780, ¶ 15, quoting *Cuyahoga Cty. Bd. of Commrs. v. State*, 2006-Ohio-6499, ¶ 22 (noting " '[a] preliminary inquiry in all legal claims is the issue of standing' "); *ProgressOhio.Org, Inc. v. JobsOhio*, 2014-Ohio-2382, ¶ 11, citing Ohio Const., art. IV, § 4(B) (stating the "Ohio Constitution expressly requires standing for cases filed in common pleas court"). Whether a party has established standing to bring an action is a question of law that we review de novo. *Moore v. Middletown*, 2012-Ohio-3897, ¶ 20, citing *Cuyahoga Cty. Bd. of Commrs.* at ¶ 23.

{¶ 17} Standing depends on "whether the plaintiffs have alleged such a personal stake in the outcome of the controversy that they are entitled to have a court hear their case." *ProgressOhio.Org, Inc. v. JobsOhio*, 2014-Ohio-2380, ¶ 7. "At a minimum, common-law standing requires the litigant to demonstrate that he or she has suffered (1) an injury (2) that is fairly traceable to the defendant's allegedly unlawful conduct and (3) is likely to be redressed by the requested relief." *Ohioans for Concealed Carry, Inc. v. Columbus*, 2020-Ohio-6724, ¶ 12, citing *Moore* at ¶ 22. "These three factors—injury, causation, and redressability—constitute 'the irreducible constitutional minimum of standing.' " *Moore* at ¶ 22, quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

{¶ 18} An injury involves " 'an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent["], not "conjectural" or "hypothetical." ' " *Cool v. Frenchko*, 2022-Ohio-3747, ¶ 23 (10th Dist.), quoting *Lujan* at 560. "Although a declaratory-judgment action generally contemplates that the action is brought before an injury-in-fact has occurred, a plaintiff must nonetheless demonstrate 'actual present harm or a significant possibility of future harm to justify pre-enforcement relief.' " *Ohioans for Concealed Carry, Inc.* at ¶ 32, quoting *Peoples Rights Org., Inc. v. Columbus*, 152 F.3d 522, 527 (6th Cir. 1998). *See also Akron Metro. Hous. Auth. Bd. of Trustees v. State*, 2008-Ohio-2836, ¶ 11 (10th Dist.), citing *N. Canton v. Canton*, 2007-Ohio-4005, ¶ 11 (stating that "to have standing to challenge the constitutionality of legislation, a party must have a direct interest in the legislation of such a nature that his or

her rights will be adversely affected by its enforcement"). An injury is fairly traceable to a defendant's conduct when "the conduct complained of [is] causally connected to the injury." *Bourke v. Carnahan*, 2005-Ohio-5422, ¶ 10 (10th Dist.), citing *Lujan* at 560. Finally, it must be likely, as opposed to merely speculative, that a favorable decision will redress the injury. *Id.*, citing *Lujan* at 560-561.

{¶ 19} A court "must determine whether standing exists by examining the state of affairs at the time the action commenced." *U.S. Bank Natl. Assn. v. Gray*, 2013-Ohio-3340, ¶ 20 (10th Dist.), citing *Deutsche Bank Natl. Trust Co. v. Najar*, 2013-Ohio-1657, ¶ 57 (8th Dist.). "Standing is an indispensable part of the plaintiff's case" and the plaintiff must prove standing "with the manner and degree of evidence required at the successive stages of litigation." *Id.*, citing *Lujan* at 561. *See also Huff v. Telecheck Servs.*, 923 F.3d 458, 462 (6th Cir. 2019). Standing is not dispensed in gross; rather, a plaintiff must establish standing for each claim presented and each form of relief sought. *Preterm-Cleveland, Inc. v. Kasich*, 2018-Ohio-441, ¶ 30.

{¶ 20} "Lack of standing challenges a party's capacity to bring an action and is properly raised by a Civ.R. 12(B)(6) motion to dismiss for failure to state a claim upon which relief can be granted." *Cramer v. Javid*, 2010-Ohio-5967, ¶ 10 (10th Dist.), citing *Brown v. Columbus City Schools Bd. of Edn.*, 2009-Ohio-3230, ¶ 4 (10th Dist.). *Accord Wilkins v. Harrisburg*, 2015-Ohio-5472, ¶ 38 (10th Dist.) (stating a "motion to dismiss for lack of standing is properly brought pursuant to Civ.R. 12(B)(6)"). A lack of standing is a fundamental flaw that requires dismissal. *Bourke* at ¶ 10; *Bank of Am., N.A. v. Kuchta*, 2014-Ohio-4275, ¶ 23.

{¶ 21} A Civ.R. 12(B)(6) motion to dismiss for failure to state a claim upon which relief can be granted is procedural and tests the sufficiency of the complaint. *Rudd v. Ohio State Hwy. Patrol*, 2016-Ohio-8263, ¶ 11 (10th Dist.). When ruling on a Civ.R. 12(B)(6) motion to dismiss, the trial court must presume all factual allegations in the complaint are true, construe the complaint in a light most favorable to the plaintiff, and make all reasonable inferences in favor of the plaintiff. *Brown v. Ohio Dept. of Rehab. & Corr.*, 2013-Ohio-4012, ¶ 6 (10th Dist.), citing *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192 (1988). A trial court " 'is confined to the averments set forth in the complaint and cannot consider outside evidentiary materials' " when considering a Civ.R. 12(B)(6) motion. *Morrissette v. DFS Servs., L.L.C.*, 2011-Ohio-2369, ¶ 20 (10th Dist.), quoting *Hutchinson*

*v. Beazer East, Inc.*, 2006-Ohio-6761, ¶ 14 (8th Dist.). While a trial court must presume all factual allegations contained in the complaint are true, the court need not accept as true any unsupported and conclusory legal propositions advanced in the complaint. *Rudd* at ¶ 12, citing *Morrow v. Reminger & Reminger Co., LPA*, 2009-Ohio-2665, ¶ 7 (10th Dist.).

{¶ 22} A trial court properly dismisses a complaint for failure to state a claim upon which relief can be granted when it appears beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him or her to relief. *Rudd* at ¶ 11, citing *O'Brien v. Univ. Community Tenants Union, Inc.*, 42 Ohio St.2d 242 (1975), syllabus. "[A]s long as there is a set of facts, consistent with the plaintiff's complaint, which would allow the plaintiff to recover, the court may not grant a defendant's motion to dismiss." *York v. Ohio State Hwy. Patrol*, 60 Ohio St.3d 143, 145 (1991). An appellate court reviews a trial court's dismissal pursuant to Civ.R. 12(B)(6) under a de novo standard of review. *State ex rel. Ohio Civ. Serv. Emps. Assn. v. State*, 2016-Ohio-478, ¶ 12.

{¶ 23} In the amended complaint, appellants detailed the various ways they interacted with the state board of education before H.B. 33. Ms. Newman alleged she was "deeply involved" in her children's education and became a state board of education member "to most significantly affect her daughter's education and the education of other students in Ohio." (Am. Compl. at ¶ 96-97.)

{¶ 24} Dr. Collins alleged she worked with her state board of education representative on issues related to her children's education, including by having discussions with her representative regarding "challenges related to standardized testing and the ways in which they are not appropriate measures of learning for her children and other students in their schools"; workforce development training and how "schools and the state prepare students for life after high school"; and "upcoming changes to state academic standards and assessments." (Am. Compl. at ¶ 85, 86, 88.) Dr. Collins also informed her state board representative of "the challenges her son face[d] as a struggling reader, and how he ha[d] been affected by the literacy policies developed and/or implemented by the State Board," and how her local school's implementation of a dyslexia policy "led to confusion." (Am. Compl. at ¶ 89-90.) She "encouraged her representative to work at the state level to resolve these issues and provide clarity to local schools struggling to implement this policy." (Am. Compl. at ¶ 90.)

{¶ 25} Ms. Eichenberg, a member of the TPS Board, stated she "regularly communicated with elected State Board members to ensure that the State Board was cognizant of the Toledo Public Schools' needs, and that the schools were compliant with state requirements." (Am. Compl. at ¶ 93.) She claimed she educated the state board of education on the "harms caused by the third-grade retention requirement in her children's schools, ultimately helping to convince the State Board to support amending the requirement," and about programs and services TPS provided to its students to "help[] stave off changes that might have destroyed those programs." (Am. Compl. at ¶ 93-94.) Ms. Eichenberg alleged she was currently seeking a physical education waiver for her daughter, which required "cross-district coordination," and claimed she "intend[ed] to contact elected State Board members to assist in this process." (Am. Compl. at ¶ 95.)

{¶ 26} The TPS Board also noted it had various interactions with the state board of education before H.B. 33, including: (1) inviting state board of education members to tour schools in the TPS system and attend TPS Board meetings; (2) contacting state board members on numerous occasions, "both to understand state policies and requirements and to advocate for policies that are appropriate for Toledo schools"; and (3) "advocat[ing] in the past for this process [regarding academic distress commissions] to be overhauled," ultimately helping "to convince the State board to support a moratorium on new academic distress commissions." (Am. Compl. at ¶ 75-76.)

{¶ 27} The TPS Board frequently communicated with the state board of education to ensure TPS's curricula were consistent with statewide educational standards and "presented to the State Board about the need for social-emotional learning in urban schools." (Am. Compl. at ¶ 77-78.) "In part due to the TPS Board's urging, the State Board adopted standards regarding social-emotional learning, which helped the TPS Board build and maintain a consistent curriculum." (Am. Compl. at ¶ 78.) The TPS Board also communicated with the state board of education "to ensure that their programs and policies for supporting students with special needs [were] appropriate." (Am. Compl. at ¶ 80.)

{¶ 28} Appellants claimed they would "lose most if not all of the[] benefits" of a "responsive, transparent State Board" if H.B. 33 took effect. (Am. Compl. at ¶ 163-164.) Appellants claimed H.B. 33 would cause them to "los[e] the advocates who were once their best chance of affecting education policy at the state level" and to lose state board of education members who were "available to obtain answers to questions or access to

educational resources." (Am. Compl. at ¶ 167-168.) Appellants acknowledged the state board of education would continue to exist after H.B. 33 became effective, but claimed the state board of education would be "virtually powerless to respond to the problems that their constituents raise[d]." (Am. Compl. at ¶ 170.) Additionally, appellants alleged if H.B. 33 took effect, they would "no longer have access to public meetings of the body setting educational and operational standards,[] nor public hearings before adoption or amendment of education rules and regulations." (Am. Compl. at ¶ 164.)

{¶ 29} A concrete injury is one that "actually exist[s]," i.e. it is real and not abstract. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). *See TransUnion L.L.C. v. Ramirez*, 594 U.S. 413, 424-425 (2021), quoting *Spokeo, Inc.* at 341 (explaining an injury is concrete when it "has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts," including "physical harms and monetary harms," as well as "[v]arious intangible harms"). The injury need not be large, "but only 'palpable.' " *Ohio Democratic Party v. LaRose*, 2020-Ohio-4664, ¶ 19 (10th Dist.), quoting *League of United Latin Am. Citizens v. Kasich*, 2012-Ohio-947, ¶ 21 (10th Dist.). *See Id.* at ¶ 21 (finding the plaintiff had standing because, while the plaintiff was unlikely to "spend much time or money in delivering his absentee ballot to his board of elections or a mail receptacle," he would incur a "real—not an abstract or suspected—loss of resources" by doing so, and the loss was "specific to *his* time and money, not the public generally"). (Emphasis in original.)

{¶ 30} An injury is particularized when the injury "is not bo[]rne by the population in general, but affects the plaintiff in a personal and individual way." *Ohio Democratic Party* at ¶ 19, citing *Spokeo, Inc.* at 339. Thus, "[a] plaintiff who complains only of an injury sustained by the general public raises a generalized grievance against the law instead of establishing a particularized injury." *Id.* at ¶ 23, citing *State ex rel. Walgate v. Kasich*, 2016-Ohio-1176, ¶ 19. *See State ex rel. Masterson v. Ohio State Racing Comm.*, 162 Ohio St. 366, 368 (1954) (holding that "private citizens may not restrain official acts when they fail to allege and prove damage to themselves different in character from that sustained by the public generally"); *Fed. Election Comm. v. Akins*, 524 U.S. 11, 23 (1998), citing *Warth v. Sledin*, 422 U.S. 490, 500 (1975) (explaining that, "[w]hether styled as a constitutional or prudential limit on standing, the Court has sometimes determined that where large numbers of Americans suffer alike, the political process, rather than the judicial process, may provide the more appropriate remedy for a widely shared grievance"). Even an

"arguable violation of an explicit prohibition of the Constitution" will be "insufficient to support standing," so long as the plaintiff's injury is "one he shared with 'all members of the public.' " *United States v. Richardson*, 418 U.S. 166, 178 (1974). *See also Lance v. Coffman*, 549 U.S. 437, 442 (2007).

{¶ 31} The trial court found appellants' alleged injuries similar to the generalized grievances alleged by certain plaintiffs in *Walgate*, 2016-Ohio-1176. The plaintiffs in *Walgate* sued the state claiming certain legislative enactments related to gambling in this state were unconstitutional. One group of plaintiffs claimed they had standing to challenge the gambling laws because they had experienced the negative effects of gambling ("gambling group plaintiffs"). The *Walgate* court found the gambling group plaintiffs' "alleged 'interest in being protected from the negative effects of unauthorized gambling' [was] an interest shared by the general public" and therefore insufficient to support standing. *Id.* at ¶ 26. Another group of plaintiffs in *Walgate* claimed they had standing because they were parents of public-school students and a public-school teacher ("parent/teacher plaintiffs"), who were interested "in preventing the unconstitutional diversion of lottery and casino proceeds from funds dedicated to educational use." *Id.* at ¶ 30. The *Walgate* court found the parent/teacher plaintiffs' "interest in ensuring that the public-school system receive[d] the proper funds [was] shared by the general public" and therefore insufficient to support standing. *Id.* at ¶ 33.

{¶ 32} The trial court found appellants' alleged injuries in the present case similar to the injuries alleged by the gambling group plaintiffs and the parent/teacher plaintiffs in *Walgate* because "[a]ll members of society, including the [appellants] here, share the interest of 'meaningful, transparent, publicly accessible representation' when it comes to education policy in Ohio." (Decision at 8.) Appellants contend the trial court's reliance on *Walgate* was misplaced because *Walgate* was "fundamentally a case about taxpayer standing—whether being taxed to fund a government program is a legally cognizable injury." (Appellant's Brief at 33.) However, the gambling group plaintiffs and the parent/teacher plaintiffs in *Walgate* claimed standing based on their respective interests in being protected from the negative effects of gambling and in having well-funded public schools. These groups of plaintiffs did not claim standing based solely on their status as taxpayers. *Compare Walgate* at ¶ 35-43 (finding a separate group of plaintiffs, who

claimed standing based on their status as taxpayers, also lacked standing). We find no error in the trial court's reliance on *Walgate*.

{¶ 33} Appellants further contend, relying on *Gonidakis v. LaRose*, 599 F.Supp.3d 642 (S.D.Ohio 2022), that they can satisfy the injury element of standing even if their "injuries were shared by many across the State." (Appellants' Brief at 30.) The plaintiffs in *Gonidakis* claimed Ohio's failure to produce fair legislative redistricting maps in time for the 2022 primary elections deprived them of "any legislative districts that would allow them to organize, campaign, and ultimately vote for offices as they had in past election cycles." *Id*. at 653. The *Gonidakis* court noted the right to vote is a fundamental right, " 'preservative of other basic civil and political rights.' " *Id*. at 655, quoting *Reynolds v. Sims*, 377 U.S. 533 (1964). Thus, "[d]espite its global import," a person's "right to vote is individual and personal in nature." *Id*., citing *Baker v. Carr*, 369 U.S. 186, 204-206 (1962). As such, although the plaintiffs in *Gonidakis* sought relief that would "benefit all Ohioans interested in voting in the primaries," the court noted the plaintiffs were in court "to ensure that they can cast their own ballots," which was "a textbook individualized harm." *Id*. at 658.[4]

{¶ 34} Thus, the plaintiffs' injury in *Gonidakis* concerned their right to vote in the upcoming primary election. Appellants' alleged injuries in the present case do not implicate a fundamental right similar to the right to vote. *See Rowitz v. McClain*, 2019-Ohio-5438, ¶ 21 (10th Dist.) (observing that while "courts have recognized a fundamental right to vote, to marry, to procreate, parental rights, and of privacy," courts have "rejected classifying things such as education, safe housing, and public welfare assistance as fundamental rights"). As such, we find *Gonidakis* distinguishable from the present case.

{¶ 35} Appellants also claim the trial court erred by dismissing the present case because "[c]ourts have recognized that parents have standing to challenge governmental actions that they believe will determinately affect their children and their children's education." (Appellant's Brief at 31.) Parents have a fundamental right to "make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). *Accord In re C.F.*, 2007-Ohio-1104, ¶ 28, citing *Troxel* at 66 (explaining the

---

[4] The Supreme Court of Ohio recently observed that "election-mandamus cases represent the outer bounds of the standing requirement." *State ex rel. Martens v. Findlay Mun. Ct.*, 2024-Ohio-5667, ¶ 12, fn.1. In such cases, it is the "particular injury to [the elector's] vote" that allows the elector to "satisfy the standing requirement." *Id*.

"right to parent one's children is a fundamental right"). Thus, parents have standing to challenge governmental actions that burden their fundamental parental rights. *See, e.g.*, *Doe v. Bethel Local School Dist. Bd. of Edn.*, 2023 U.S. Dist. LEXIS 137555, *34 (S.D.Ohio Aug. 7, 2023) (finding parents had standing to challenge a school district's policy regarding transgender students' bathroom usage at school because the policy "at least indirectly burden[ed the parents' fundamental right to raise their children]—considering, as the[ parents] allege[d], their religious values require them to raise their children away from transgender individuals"). In the present case, however, the Parent Plaintiffs have not alleged that H.B. 33 impacts their fundamental right to make decisions concerning the care, custody, or control of their children.

{¶ 36} In the amended complaint, appellants claimed H.B. 33 injured them because the changes to education governance in the bill resulted in appellants losing elected state board of education members who could affect education policies in this state. However, H.B. 33 deprives every Ohioan of an elected state board of education member with authority to affect education policy in this state. Although appellants noted the ways they previously interacted with their state board of education members regarding policies important to them, appellants' prior interactions with the state board of education do not alter the fact that H.B. 33 deprives every Ohioan of an elected state board member with the ability to affect education policy in this state. Accordingly, without more, appellants have presented only a generalized grievance regarding H.B. 33 in their present amended complaint.

{¶ 37} Moreover, appellants' contention that H.B. 33 injured them by causing them to "los[e] the advocates who were once their best chance of affecting education policy at the state level," necessarily assumes DEW will not provide appellants with a similar chance to affect education policy in this state. (Am. Compl. at ¶ 167.) While appellants' assumption in this regard may be logical, until DEW *is* actually unresponsive to appellants' concerns, appellants' present allegation of harm is hypothetical. The harm appellants fear may well materialize into a concrete harm when DEW begins operations and refuses to entertain appellants' policy concerns. However, appellants filed their amended complaint on October 1, 2023, two days before the challenged provisions of H.B. 33 became effective, and courts "must determine whether standing exists by examining the state of affairs at the time the action commenced." *Gray*, 2013-Ohio-3340, at ¶ 20 (10th Dist.), citing *Najar*, 2013-

Ohio-1657, at ¶ 57 (8th Dist.). At the present juncture, appellants' allegation of harm is speculative and insufficient to support standing. *Compare TransUnion*, 594 U.S. 413 at 436 (observing that if the "risk of future harm materializes and the individual suffers a concrete harm, then the harm itself, and not the pre-existing risk, will constitute a basis for the person's injury"; but if the "risk of future harm does *not* materialize, then the individual cannot establish a concrete harm sufficient for standing"). (Emphasis in original.)

{¶ 38} Appellants also claimed that, as a result of H.B. 33, they would no longer have a state board of education member who could "help them understand" education policies or provide them with "answers to questions." (Am. Compl. at ¶ 163, 168.) Appellants contentions in this regard fail to allege a particularized injury and present only a hypothetical injury. H.B. 33 did not abolish the state board of education or alter the number of elected state board members. Accordingly, because the state board of education still exists, at least in form if not in substance, appellants can continue to contact their state board of education member and ask them questions regarding education policies.

{¶ 39} Appellants claimed H.B. 33 injured them because they would no longer have access to public meetings of the body setting educational standards in this state or to public hearings before DEW adopted or amended rules related to education. However, H.B. 33 requires DEW to hold public meetings once every month and to entertain public comments before engaging in rulemaking. *See* R.C. 3301.137; R.C. 3301.138.[5] Appellants did not allege

---

[5] R.C. 3301.137 requires the director to "convene a public meeting at least once every other month," where employees of the DEW "shall conduct a presentation . . . that addresses any new information the department has about any of its significant new or existing initiatives, policies, or guidelines;" to "provide an opportunity for public discussion on the information provided in the presentation" at the conclusion of the hearing; and permits the director to "accept public discussion about other topics as the director, or the director's designee, determines appropriate." R.C. 3301.137(A), (B). R.C. 3301.137(C) requires the DEW to "make available via the internet an audio recording of each public meeting under this section." R.C. 3301.138 states that, before DEW initiates the process to adopt, amend, or rescind a rule, it must provide interested parties with a "link to a web page on the department's web site that provides an opportunity to review the current rule, if one exists, and submit public comments for a period of time established by the department." R.C. 3301.138(B)(1)(b). The DEW must "[c]onsider each comment [it] receives during the public comment period when drafting the rule." R.C. 3301.138(B)(1)(c). Appellants noted the state board of education held meetings on the second Monday and Tuesday of each month that were "generally open to the public," and noted the state board's "schedules, agendas, and meeting minutes [were] published and publicly accessible, as [were] video recordings of its meetings." (Am. Compl. at ¶ 61.) Appellants also noted the state board "solicit[ed] public testimony and public comments when it engage[d] in rulemaking." (Am. Compl. at ¶ 62.) As noted, however, appellants did not explain how the differences between the state board of education's public meetings and public comment periods and DEW's public meetings and public comment periods injured them in a particular way.

facts sufficient to explain how the public meetings and public comment periods provided by H.B. 33 would cause them actual, particularized injuries.

{¶ 40} Accordingly, appellants failed to allege an injury sufficient to support standing in the present case. Therefore, appellants lacked standing to assert their constitutional challenges to H.B. 33, and the trial court properly granted defendants' Civ.R. 12(B)(6) motion to dismiss for lack of standing.[6] Based on the foregoing, we overrule appellants' first assignment of error.

## IV. Second Assignment of Error: Count 3

{¶ 41} Appellants' second assignment of error asserts the trial court erred by finding appellants failed to state a claim for relief on the merits in Count 3 of their amended complaint and by finding appellants lacked standing to pursue Count 3. However, because the trial court found appellants failed to allege an injury sufficient to support standing for any of their claims, the trial court's further statements regarding Count 3 were dicta. *See Heisler v. Mallard Mech. Co., L.L.C.*, 2010-Ohio-5549, ¶ 13 (10th Dist.), quoting *Gissiner v. Cincinnati*, 2008-Ohio-3161, ¶ 15 (1st Dist.) (noting that " '[d]icta includes statements made by a court in an opinion that are not necessary for the resolution of the issues' ").

{¶ 42} In our resolution of appellants' first assignment of error, we affirmed the trial court's conclusion that appellants lacked standing to assert any of their claims. Accordingly, because the trial court properly granted defendants' motion to dismiss for lack of standing, appellants' contentions regarding Count 3 are moot.[7] Therefore, our ruling on

---

[6] Appellants also claim the trial court "fail[ed] to consider Ohio's recognition of a public-rights exception to traditional standing requirements," as announced in *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451 (1999). (Appellant's Brief at 36.) However, appellants did not raise the public-rights exception to standing in the trial court and therefore waived the issue. *See Premiere Radio Networks, Inc. v. Sandblast, L.P.*, 2019-Ohio-4015, ¶ 7 (10th Dist.) (noting "[i]ssues raised for the first time on appeal are deemed to have been waived or forfeited through failure to assert them before the trial court"). Moreover, the Supreme Court of Ohio recently overruled *Sheward* and held that "no[] future litigant[] may rely on [the public-rights exception] to bypass our well-established standing requirement." *State ex rel. Martens v. Findlay Mun. Ct.*, 2024-Ohio-5667, ¶ 23. Accordingly, the public-rights exception to standing no longer exists in this state.

[7] Although moot, we find the trial court's determination that appellants failed to state a claim for relief on the merits of Count 3 questionable. Count 3 asked the court to issue a declaratory judgment finding the challenged provisions of H.B. 33 violated Ohio Const., art. VI, § 4. As noted, Ohio Const., art. VI, § 4 provides there "shall be a state board of education" and that the "powers and duties of the board . . . shall be prescribed by law." Because Ohio Const., art. VI, § 4 allowed the General Assembly to prescribe the duties of the state board of education, the trial court found the General Assembly could "significantly curtail[]" the powers and duties of the state board of education, so long as it did not "abolish the State Board of Education." (Decision at 10-11.) However, courts from other states have found that, even when a legislature has the power to prescribe by law the powers and duties of a constitutionally created office, the legislature cannot enact legislation that deprives the constitutional office of its inherent powers. *See Powers v. State*,

appellants' first assignment of error renders appellants' second assignment of error moot. *See* App.R. 12(A)(1)(c). *See also State ex rel. N. Ohio Chapter & Contrs., Inc. v. Barberton City Sch. Bd. of Edn.*, 2010-Ohio-1826, ¶ 26 (9th Dist.) (finding plaintiffs' contention "the trial court erred in dismissing their complaint for their failure to state a claim" on the merits moot, because the appellate court "already determined that [plaintiffs] lacked standing in th[e] matter"); *Martin v. Ohio Univ.*, 2023-Ohio-2511, ¶ 54 (4th Dist.).

## V. Conclusion

{¶ 43} Having overruled appellants' first assignment of error, rendering appellants' second assignment of error moot, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

JAMISON, P.J., and EDELSTEIN, J., concur.

———————————————

2014 WY 15, ¶ 22 (explaining that the "phrase 'as prescribed by law' does not permit the legislature to abolish or transfer, either directly or indirectly, the inherent powers of a constitutionally created office," and therefore finding a law that transferred nearly all the duties of the constitutional office of the superintendent of public instruction to the director of the Wyoming department of education, a position appointed by the governor, unconstitutional); *State ex rel. Mattson v. Kiedrowski*, 391 N.W.2d 777, 780 (Minn. 1986) (holding that, although the constitution allowed the legislature to prescribe by law the powers and duties of the state's treasurer, "the prescribed-by-law provision" of the constitution did "not allow a state legislature to transfer inherent or core functions of executive officers to appointed officials"); *Hudson v. Kelly*, 76 Ariz. 255, 265 (1953) (stating the "legislature should have known that it could not denude the [constitutionally created] office [of the state auditor] of its inherent powers and duties, even though they had been prescribed by statute, and leave the office as an empty shell"); *Wright v. Callahan*, 61 Idaho 167, 181 (1940) (observing that to "permit the legislature to create an office and vest in the appointee the powers and duties conferred upon a constitutional officer, would be to permit the legislature to nullify the Constitution").